**UNITED STATES of America, Plaintiff,**

v.

**Reginald HARRIS, Defendant.**

**Crim. No. 89–37–MAC(DF).**

United States District Court,
M.D. Georgia,
Macon Division.

July 18, 1989.

Deborah G. Fowler, Michael Solis, Macon, Ga., for plaintiff.

Sonja L. Salo, Atlanta, Ga., for defendant.

FITZPATRICK, District Judge.

Pending before the court is Defendant Reginald Harris' Motion to Suppress certain evidence obtained on March 26, 1989, during a vehicular stop and subsequent search of the rental car being driven by Harris. A hearing on the Motion to Suppress was held on July 10, 1989. Following the hearing, both sides submitted supplemental briefs. After considering the evidence that has been submitted and the arguments of the parties, the court finds that the Motion should be denied. The court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

On the morning of March 26, 1989, Dooly County Deputy Craig Peavy was running a radar check on traffic headed southbound on Interstate 75, while parked under the Exit 36 bridge in Dooly County, Georgia. Deputy Peavy's car was facing north. At approximately 10:55 a.m., Deputy Peavy spotted a northbound 1989 Dodge Dynasty weave over the edge of the emergency lane. Although he could not see exactly how far into the emergency lane the car had crossed, Deputy Peavy testified that he thought the driver was either drunk or falling asleep at the wheel. Based on this assumption, Deputy Peavy decided to follow the car. Defendant Harris was driving the Dynasty, which had a "National" car rental bumper sticker on the rear easily read from a distance.

After following the car for a short time, Deputy Peavy saw the driver again weave into the emergency lane. Deputy Peavy testified that the right tires of the car had crossed 2 to 3 inches over the white emergency line. At that point, Deputy Peavy turned on his blue lights, and Defendant Harris pulled the car over to the side of the road.

Upon completing the stop, Deputy Peavy walked up to Harris and asked him if he had been drinking. Harris told Deputy Peavy that he did not drink. Deputy Peavy did not question Harris any further about drinking, nor did he administer any road side alcohol tests. Deputy Peavy then asked Harris why he had weaved off the road, and Harris stated that his knee was hurting due to a previous automobile accident, that he was tired, and that he had looked back at Deputy Peavy when he passed him.

After being informed by Harris that the Dodge Dynasty was a rental car, Deputy Peavy asked Harris for the rental agreement. Harris was listed as the renter, and "Fred Williamson" was listed as an additional driver. Deputy Peavy then asked Harris if he was coming from Florida. Deputy Peavy thought Harris gave an affirmative response. When Deputy Peavy asked Harris what part of Florida, Harris stated that he had not been to Florida. After pausing a few seconds, Harris then stated that he was coming back from Valdosta where he had dropped off a friend.

During this brief conversation, Deputy Peavy was checking Harris' license. Harris' license had the word "Limited"

stamped across the front. Deputy Peavy testified that during their conversation, Harris appeared to be very nervous. After the conversation ended, Deputy Peavy asked Harris to have a seat in the Dynasty while he ran a computer check on the license.

At this point, Deputy Peavy called Georgia State Patrol Trooper Strickland for assistance. He then ran a check on the license. After running the check, Deputy Peavy learned that Harris' license was restricted for work purposes only. Deputy Peavy then approached Harris and informed him what the license check had revealed. Deputy Peavy also gave Harris a warning ticket for crossing into the emergency lane. According to Deputy Peavy, Harris then shook Deputy Peavy's hand and told him that he appreciated the break.

Following this brief exchange, Deputy Peavy asked Harris if he could take a look in the Dynasty. Harris said he did not want Deputy Peavy to look in the car. By that time Trooper Strickland had arrived on the scene. Deputy Peavy then stated that since he had only given Harris a warning ticket, he would appreciate some cooperation on Harris' part. At that point Harris verbally consented to a search of the car, and gestured toward the car with his arm.

During the search, Deputy Peavy asked Harris if he was hiding anything in the car. Harris did not respond. After looking in the front and back seats, Deputy Peavy took the key from the ignition and opened the trunk. Several travel bags were in the trunk. Deputy Peavy unzipped one of the bags and found ten tightly wrapped bags which appeared to be kilograms of cocaine. At this point, Deputy Peavy told Harris to put his hands on the hood of the patrol car, and he and Trooper Strickland searched Harris for any weapons or drugs. Harris was then placed in the back of Trooper Strickland's car. Deputy Peavy went back to Harris' vehicle and found nine more packages that appeared to be cocaine.

## II. DISCUSSION

In considering this motion to suppress, the court must determine; (1) whether the

stop was valid, (2) whether the detention was lawful, (3) whether Harris consented to a search of his car, and (4) whether the search was within the bounds of the consent.

### A. *Validity of the Stop*

At the suppression hearing, Deputy Peavy testified that he decided to follow Harris because he observed the car cross over into the emergency lane. According to his testimony, Deputy Peavy thought the driver could be drunk or falling asleep. He followed Harris approximately ½ mile. He also testified that he did not decide to stop the car until he observed it cross over into the emergency lane a second time.

Harris contends that the stop was pretextual. He argues that he was stopped because he fit the "profile" of a drug courier, *i.e.*, he is a black male, he is twenty-two years old, and he was driving a 1989 rental car. Harris states that since the stop was pretextual, it was in violation of those rights guaranteed to him by the fourth, fifth, and fourteenth amendments of the Constitution.

The test to be used in determining whether a particular vehicular stop passes constitutional muster is whether a reasonable officer, who is presented with the same facts available to the arresting officer, would have made the stop in the absence of an illegitimate motive. *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986). Although an officer may not stop a vehicle just because of an " 'unparticularized suspicion or 'hunch,' ' " the officer need not possess probable cause to make the stop. *United States v. Sokolow*, — U.S. —, —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883 (1968)) ("the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause"). Moreover, "[i]n evaluating the validity of a stop such as this, [the district court] must consider 'the totality of the circumstances—the whole picture.' " *Id.*, quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

After considering the evidence presented here, the court is persuaded that a reason-

able officer would have made this stop absent an illegitimate motive. The testimony showed that Harris weaved into the emergency lane on two separate occasions during a one-mile stretch on Interstate 75. Deputy Peavy did not make the stop until Harris weaved the second time. A reasonable officer could have concluded that Harris was either driving under the influence in violation of state law, or falling asleep at the wheel. Since the stop would have been justified under either conclusion, it was not unconstitutional.

Moreover, Harris' argument that he was stopped because he fit the profile of a drug courier is unavailing. In *Sokolow, supra,* the Supreme Court considered, among other things, whether a stop and detention were unconstitutional simply because the defendant fit the description of a "drug courier profile." The facts of the case were that defendant Sokolow had been stopped by Drug Enforcement Administration (DEA) agents upon his arrival at the Honolulu International Airport. Sokolow was wearing a black jumpsuit and gold jewelry. Before stopping Sokolow, the agents knew that he had paid for two airplane tickets with cash, he had been to Miami, he was traveling under a name that did not match the name under which his telephone number was listed, he appeared nervous, and he had checked none of his luggage. Sokolow argued the stop was pretextual since the agent had testified that Sokolow's behavior " 'had all the classic aspects of a drug courier.' " *Sokolow* —— U.S. at —— n. 6, 109 S.Ct. at 1587, n. 6. Apparently, Sokolow was arguing that he was stopped because he fit this "profile," and not because he was involved in suspicious or unlawful activity.

The Supreme Court concluded that the stop and detention were not unconstitutional simply because the agents may have believed that Sokolow fit the profile of a drug courier. In its discussion, the Court stated:

> A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a

"profile" does not somehow detract from their evidentiary significance as seen by a trained agent.

*Id.* at ——, 109 S.Ct. at 1587.

At the hearing, Deputy Peavy denied that the stop was pretextual, and he even testified that he did not know what a "drug profile" is. The court finds such testimony to be somewhat disingenuous since many laymen would be likely to know the makeup of a drug profile. Moreover, the court agrees with Harris that it is somewhat unusual that Deputy Peavy, who has been a police officer for three years and has completed at least one course in drug law enforcement, would not be more familiar with drug profiles. Nevertheless, Deputy Peavy has set forth those factors which led to the stop, and the fact that certain characteristics of Harris may fit a "drug profile," or that Deputy Peavy was aware of such characteristics before he made the stop, do not require a finding that the stop was unconstitutional.

For these reasons, the court finds that the stop did not violate any of Harris' constitutional rights.

### B. *Detention*

 Harris next argues that the investigative detention crossed the bounds of reasonableness, and therefore, constituted an illegal search and seizure under the fourth amendment. Specifically, Harris argues that he should have been able to leave after he was given the warning ticket.

In *Sokolow*, the Supreme Court cited with approval its holding in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow,* —— U.S. at ——, 109 S.Ct. at 1585. In the instant case, Deputy Peavy detained Harris because he had a restricted license, he was driving a rental car on I–75, the primary route used by drug smugglers traveling between Florida and Georgia, and

he appeared very nervous during their conversation. Although any one of these factors taken individually would not support a reasonable suspicion of potential criminal activity, the court must consider all of the factors together. *Id.* at ——, 109 S.Ct. at 1585. After considering these factors together, the court finds that they support a "reasonable suspicion" that "criminal activity 'may [have been] afoot.' " *Id.*[1]

The court also notes that the detention was for a very short time, and was for the sole purpose of securing Harris' consent to a search of the car. Moreover, even if Deputy Peavy had no other reason to detain Harris, he could have prohibited Harris from leaving simply on the basis that Harris' license allowed him to travel only to and from work. Consequently, Deputy Peavy could have required Harris to have someone come to get him since Harris was not authorized to drive to his next destination.

For these reasons, the court finds that the detention did not violate any of Harris' constitutional rights.

## C. *Consent*

■ The search of Harris' vehicle was based on his oral consent. Harris argues that the consent was not voluntary.

The evidence shows that when Deputy Peavy handed Harris the warning ticket, he asked Harris if he could take a look in the car. Harris said "no." Shortly after Harris said "no," Trooper Strickland arrived on the scene. Deputy Peavy then told Harris that he thought Harris should allow him to look in the car since he had only given Harris a warning ticket. At that point, Harris verbally consented to a search and gestured toward the car in a manner that further expressed his consent to the search.

The court does not agree with Harris' positions that there was no consent or that the consent was involuntary. First, there was no evidence to rebut the officers' testimony that Harris verbally agreed to the search. Second, there was absolutely no evidence that either officer forced Harris to consent. Neither officer threatened Harris in any way. Moreover, neither officer told Harris that he could not leave without consenting to a search. Finally, Harris knew that he had the right to refuse to consent to the search since he had exercised that right when asked the first time.

For these reasons, the court finds that Harris voluntarily consented to a search of the vehicle.

## D. *Scope of the Consent*

■ Harris further argues that if he did give consent, he consented only to a search of the inside of the car, and not to a search of the trunk or any personal items located in the trunk.

If an individual gives consent to a search of his vehicle, then that individual may limit the scope of the search. *See Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir.1977). In those cases in which no limitation is placed on the consent, a police officer is allowed the discretion to conduct a complete search, including closed containers. *See United States v. Kapperman,* 764 F.2d 786, 794 (11th Cir.1985). As noted by the Supreme Court, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited to the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross,* 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982).

In the instant case, Harris verbally consented to a search of his vehicle. He made no attempt to limit the search before it began. Moreover, he did not attempt to

---

1. In *Sokolow,* the Court also recognized that there may " 'be circumstances in which wholly *lawful* conduct might justify the suspicion that criminal activity was afoot.' " *Sokolow* at ——, 109 S.Ct. at 1586 (emphasis added; citation omitted). In support of this proposition, the Court cited a portion of *Terry* which held that " 'a series of acts, each of them perhaps innocent' if viewed separately," might warrant further investigation if taken together. *Id.* at ——, 109 S.Ct. at 1587 (citation omitted).

prohibit Deputy Peavy from searching the trunk or from opening the travel bags. Deputy Peavy found the alleged cocaine in the first bag he unzipped. After considering all of the evidence, the court finds that Deputy Peavy was within the bounds of the scope of the consent when he searched the travel bags in the trunk. Deputy Peavy was justified in searching the trunk since it was a part of the car and since Harris made no attempt to limit the search.

For these reasons, the court finds that Deputy Peavy did not conduct a search that fell outside the scope of Harris' consent.

### III. CONCLUSION

The court has carefully considered the arguments on both sides of the issues raised in this Motion to Suppress. While on the one hand, the court realizes that drug trafficking represents a serious threat to this nation, the court also realizes that constitutional rights cannot be trounced upon or ignored in the battle against this threat. In the instant case, however, the stop and detention were constitutional since they were based upon a reasonable suspicion of criminal activity supported by articulable facts. Moreover, even if Harris fits the "profile" of a drug courier and Deputy Peavy was aware of this when he asked to search the car, the search was not unconstitutional, as long as all of the facts together support the conclusion that the detention was based on a reasonable suspicion that criminal activity "may be afoot." After considering all of the circumstances here, the court finds that Deputy Peavy's suspicion was reasonable, and that the entire search and seizure was in line with the guarantees of the fourth, fifth, and fourteenth amendments.

Accordingly, Defendant Harris' Motion to Suppress is hereby DENIED.

SO ORDERED.