913 F.2d 1111
 UNITED STATES of America, Plaintiff-Appellant,
v.
Amaryllis THOMAS; Zenworth Thomas, Claimants-Appellees,
and
One Lot in Pawley's Island, South Carolina, Being Lot 2,
Block B, Pawley's Island, G-43 (TM# 4-181-81); Four Lots on
Prince Road, Georgetown, South Carolina, Being Lots 2, 3, 4,
and 5, M.M. West Subdivision, U-65 (TM# 5-18-217, 5-18-218,
5-18-219, 5-18-220); One Lot on Church Street, Georgetown,
South Carolina, Being Lot 9, Block C, Hazard Addition
Company, C-9 (TM# 5-13-151); Two Lots on Front Street,
Georgetown, South Carolina, Being Lots 496 and 497 on Plan
of City of Georgetown (TM# 5-23-83); One 1986 Nissan Wagon,
S.C. License RHX527, VIN JN1HM0581GX35250; One 1987 Dodge
Wagon, S.C. License RTD528, VIN 2B7FK13G7HR104067; All
Laundry Machinery Located on the Premises Commonly Known as
122 North G Street, Georgetown, South Carolina; all
Contents of Safety Deposit Box # 294 at the Georgetown
Branch Office of Citizens and Southern National Bank of
South Carolina; all Contents in the Safe Over the Fireplace
in the Residence Commonly Known as 2011 Church Street,
Georgetown, South Carolina; $25,000 Cash Bond, Defendants,
Nathaniel Green, Claimant.
 No. 89-6317.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 7, 1990.
Decided Sept. 17, 1990.
 
 John Harris Douglas, Asst. U.S. Atty. (E. Bart Daniel, U.S. Atty., on brief), Charleston, S.C., for plaintiff-appellant.
 Ellerby Delance Poston, Johnsonville, S.C., for claimants-appellees.
 Before SPROUSE and WILKINSON, Circuit Judges, and TILLEY, District Judge for the Middle District of North Carolina, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 This is a consolidated appeal of two civil actions filed pursuant to 21 U.S.C. Sec. 881(a)(6) to obtain forfeiture of a $25,000 cash bond and certain real and personal property. The district court held that the government failed to demonstrate probable cause that the properties listed in the complaints were the proceeds of illegal drug transactions.
 
 
 2
 We reverse.
 
 I.
 
 3
 Zenworth Thomas, a thirty-eight year old native of Antigua, British West Indies, claims ownership of the property the government seeks to forfeit. Thomas came to the United States in 1969 and settled in New York City where he owned and operated a small grocery store. In 1976, he moved to Georgetown, South Carolina, with his wife Amaryllis Thomas. While in Georgetown, Thomas took odd jobs, and owned and operated a number of small businesses. Thomas later became the owner/operator of Rasta International, a grocery store, bar, and restaurant.
 
 
 4
 In the course of an undercover drug investigation in 1986, the Georgetown Police Department began to focus on the activities of Mr. Thomas. Thomas was known by police to have a history of involvement in drug-related activities. His criminal record included three convictions for possession of marijuana in 1976, 1978, and 1986. The arrests in connection with the 1976 and 1986 convictions occurred in Georgetown.
 
 
 5
 Pursuant to the investigation, Officer Jerome Howard of the Georgetown Police Department made three undercover drug buys at or near the business premises of Rasta International. On November 29, 1986, Howard met with an individual identified to him as Alfonso Andrews. Andrews drove Howard to Rasta International, entered the establishment, and emerged with an amount of cocaine known as an "8-Ball" which he sold to Howard for $235. On December 4, 1986, Howard purchased an eighth of an ounce of cocaine for $120 from Gregg Deas, an employee of Rasta International, at or near Rasta. On that occasion Howard also inquired whether Deas could procure a half ounce of cocaine for him. Deas indicated that only "Mr. T" could do that, and took Howard into Rasta International to speak with him. "Mr. T" declined to deal with Howard because he "did not know" him. Finally, on December 6, 1986, Howard purchased $100 worth of cocaine from Deas outside Rasta International.
 
 
 6
 Also in connection with the undercover investigation, Detective Kenneth Arthur of the Georgetown Police Department participated in an inspection of Rasta International by the South Carolina Alcohol Beverage Control Commission in 1986 and a search of the same establishment on January 29, 1987. He observed what appeared to be a large quantity of drug packaging material, but no drugs were actually found. Detective Arthur was also able to document that between June 1986 and March 1987, Thomas spent approximately $137,000 in cash on items other than necessities. Thomas admitted to some $105,000 of these expenditures.
 
 
 7
 In addition, police found evidence of unusual travel habits on the part of Thomas. According to the testimony of a Piedmont Airlines employee, Thomas on numerous occasions appeared without luggage at the Charleston, South Carolina, terminal a few minutes before the plane to Miami, Florida, was to depart and paid cash for a one-way ticket. Records from the National Car Rental System, Inc. during the period from April 1986 to February 1987 showed that on ten separate occasions, Thomas rented cars for trips from Miami to Charleston.
 
 
 8
 In 1986, following Thomas' latest conviction for possession of marijuana, the Immigration and Naturalization Service initiated deportation proceedings against him. Thomas had been an illegal alien in this country for some seventeen years. On March 17, 1987, Thomas was deported to Antigua.
 
 
 9
 On May 11, 1987, the government filed a complaint in the United States District Court for the District of South Carolina for the forfeiture of certain real and personal property. On August 21, 1987, a second complaint was filed in the Northern District of Georgia for forfeiture of a $25,000 bond posted by Thomas after he was arrested by the Immigration and Naturalization Service. The district court in each case permitted the government to seize the properties and bond. Zenworth Thomas and his wife then filed claims seeking the return of the properties and bond.
 
 
 10
 The district court held a bench trial on both cases. After the close of the government's case on probable cause, the judge, with the consent of the parties, deferred a ruling on that issue and required claimants to present evidence that the property was not connected to illegal drug transactions. At the close of the evidence the district court ruled that the government had not shown probable cause for its belief that there was a substantial connection between the property to be forfeited and illegal, drug-related activities. The court ordered the return to Thomas of the confiscated property and the $25,000 cash bond.
 
 
 11
 The government appeals.
 
 II.
 
 12
 Title 21 U.S.C. Sec. 881(a)(6) provides for forfeiture to the United States of
 
 
 13
 [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.
 
 
 14
 In forfeiture proceedings pursuant to this section, the government has the initial burden of demonstrating "probable cause for the belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by statute." Boas v. Smith, 786 F.2d 605, 609 (4th Cir.1986) (quoting United States v. $364,960 in United States Currency, 661 F.2d 319, 323 (5th Cir.1981)). See 21 U.S.C. Sec. 881(d); 19 U.S.C. Sec. 1615. The burden then shifts to the claimant to establish, by a preponderance of the evidence, that the property was not acquired in violation of the law or otherwise linked to illegal drug activity. See Boas, 786 F.2d at 609. If upon rebuttal the claimant is unable to demonstrate that the property was not involved with drug activity, "a showing of probable cause alone will support a judgment of forfeiture." United States v. One 1980 Red Ferrari, 875 F.2d 186, 188 (8th Cir.1989).
 
 
 15
 "Probable cause" for the purpose of forfeiture proceedings is the same standard used in search and seizure cases. See id.; United States v. One 1975 Mercedes 280S, 590 F.2d 196, 199 (6th Cir.1978). It requires the court to "make a practical, common-sense decision whether, given all the circumstances set forth ... including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that the properties to be forfeited are proceeds of illegal drug transactions. Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "[D]irect connection between the property subject to seizure and the illegal activity that renders the items forfeitable need not be shown in order to establish probable cause." United States v. Edwards, 885 F.2d 377, 390 (7th Cir.1989). Rather, "where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds." Id. at 390.
 
 III.
 
 16
 Despite findings of fact as to Thomas' criminal record, the presence of circumstances suggesting illegal drug activity on his part, and the documentation of expenditures far exceeding Thomas' legitimate income, the district court concluded that the government had not met its burden of showing probable cause. We think the district court took too stringent a view of the legal standard involved in establishing probable cause and too dismissive a view of its own factual findings.
 
 
 17
 For example, the district court found that during a nine-month stretch from June 1986 to March 1987 Thomas made cash expenditures totalling $137,000, including the $25,000 cash bond. It is uncontroverted that Thomas purchased the six lots at issue with cash or with borrowed money that was subsequently repaid with cash. The court failed to note the significance of this evidence, namely that the possession of unusually large amounts of cash, see United States v. $215,300 United States Currency, 882 F.2d 417, 419 (9th Cir.1989); United States v. $93,685.61 in United States Currency, 730 F.2d 571, 572 (9th Cir.1984); United States v. $2,500 in United States Currency, 689 F.2d 10, 16 (2d Cir.1982), or the making of uncommonly large cash purchases, United States v. Certain Real Property Situated at Route 3, Box 247E, Mountain Home, AR, 568 F.Supp. 434, 436 (W.D.Ark.1983), may be circumstantial evidence of drug trafficking. Here the undisputed cash expenditures vastly exceeded Thomas' legitimate income. During this period, Thomas' only source of income was his business, Rasta International. Records from the City of Georgetown show that Thomas reported only $13,964 in gross income on his business license applications for Rasta International for the years 1983 through 1986. Similarly, Thomas' tax returns, which concededly reflected the actual income from the business, report an income of approximately $11,000 in 1985 and $1,300 in 1986. According to the testimony of his wife, Thomas also had significant obligations during this period: two separate households with a woman and five children in each. Evidence that cash expenditures by Thomas--a suspected drug trafficker--hugely exceeded any verifiable income suggest that the money was derived illegally. See Edwards, 885 F.2d at 390; United States v. $250,000 in United States Currency, 808 F.2d 895, 899 (1st Cir.1987).
 
 
 18
 There was much more evidence implicating Thomas in illegal drug activities. Unfortunately, the district court tended to consider this evidence piecemeal, rather than as parts of a total picture. See Gates, 462 U.S. at 238, 103 S.Ct. at 2332. Courts have been cautioned not to dissect strands of evidence as "discrete and disconnected occurrences," United States v. Wallraff, 705 F.2d 980, 988 (8th Cir.1983), but to apply the probable cause standard to the facts in their totality. This larger view of the evidence leaves little room for doubt as to Thomas' activities. The evidence presented by the government, most of which was credited by the district court, showed that Thomas made regular unexplained trips by plane from Charleston, South Carolina, to Miami, Florida, and by rental car from Miami to Charleston, that he had a history of drug related arrests and convictions both in Florida and South Carolina, and that he was implicated in undercover drug buys at the business he owned and operated. We address the importance of each of these items of evidence in turn.
 
 
 19
 The district court recited evidence that in 1986 and 1987, Thomas made numerous one-way flights by plane from Charleston, South Carolina, to Miami, Florida, and at least ten documented one-way trips by rental car from Miami to Charleston. There was testimony that Thomas was given the nickname "Paratrooper" by Piedmont Airlines employees because he would take off on the plane but would never return. The pattern of travel employed by Thomas is recognized by narcotics agents as a common strategy for transporting illegal drugs. Moreover, it was a bizarre schedule of movements for the owner of a small variety store in South Carolina, and no explanation for it was ever offered. See Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"). The court ultimately disregarded the evidence because the government was unable to show whether the car rentals and plane flights were precisely linked in time.[1] We do not believe it necessary for the government to establish the exact dates of these travels in order for the evidence to be accorded weight. The trips were linked generally in time: Thomas made numerous flights from Charleston to Miami between 1985 and 1988 and ten trips from Miami to Charleston by rental car during a portion of this period, between April 1986 and February 1987.
 
 
 20
 Thomas' travel pattern is significant in several respects not recognized by the district court. Miami, Florida, is a known source city for narcotics and other illegal drugs. See United States v. Mendenhall, 446 U.S. 544, 562, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980). Thomas would arrive at the ticket counter a short time before departure of the Miami flight and pay cash for a one-way ticket, a pattern employed by drug couriers presumably to avoid extended surveillance and to maintain anonymity. See United States v. Nunley, 873 F.2d 182, 185 (8th Cir.1989); United States v. Alpert, 816 F.2d 958, 961 (4th Cir.1987); United States v. Espinosa-Guerra, 805 F.2d 1502, 1508 (11th Cir.1986). In addition, Thomas traveled with no baggage, also typical of drug traffickers who often fly into a city intending to make their drug contact and immediately depart. Espinosa-Guerra, 805 F.2d at 1508. Finally, illegal transport of drugs often involves the use of rental cars traveling from source cities such as Miami. See United States v. Pino, 855 F.2d 357, 358 (6th Cir.1988); United States v. Harris, 716 F.Supp. 1470, 1473-74 (M.D.Ga.1989). While these factors might not in isolation be conclusive of illegal conduct, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," and even "innocent behavior" when considered in its overall context may "provide the basis for a showing of probable cause." Gates, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13.
 
 
 21
 We further agree with appellant that the district court erred in failing to consider evidence of drug-related activity in Florida, which strengthened the inference that Thomas' unusual travel habits involved the transportation of illegal substances. Without explanation the court failed to address the fact that Thomas was convicted in Florida in connection with a January 21, 1983, arrest at Miami International Airport for possession of fifteen pounds of marijuana. The district court also refused to consider uncontroverted evidence that Thomas was arrested two additional times in Florida for possession of drugs; on March 24, 1984, for possession of twenty-seven pounds of marijuana and $1,431.47 in cash, and on August 15, 1985, for possession of twenty-two pounds of marijuana and $8,400 in cash. The charges as to both arrests were not prosecuted, and the district court apparently believed that it could only consider convictions in its probable cause determination. However, the fact that an individual was arrested for possession of illegal drugs is probative evidence in this context since it is only the probability of a connection between criminal conduct and the property to be forfeited that the government must establish. See United States v. United States Currency, $83,310.78, 851 F.2d 1231, 1236 (9th Cir.1988) (prior arrest probative evidence for probable cause determination).
 
 
 22
 It is also undisputed that Thomas had a history of illegal drug activity in Georgetown, South Carolina, including three convictions for possession of marijuana. In addition, the district court discounted the testimony of undercover Agent Howard who made three drug buys at or near Rasta International. On December 4, 1986, the agent attempted to purchase additional cocaine from a "Mr. T" inside Rasta International. In connection with that transaction, he was asked, "Did you see Zenworth Thomas any other time?" Agent Howard responded that, "Each time I made a buy near the establishment, I saw Mr. T inside ... behind the counter, walking around ... He was always there. Always present each time I went there to make a narcotics buy." The district court erred in failing to accord this evidence any weight in connecting Thomas to the illegal drug activity at the business establishment that he owned and operated.
 
 
 23
 Finally the government introduced certain statements by informants Jeanette Sturkin and Ben Livingston, Jr. to the effect that each of them had purchased drugs from Thomas and that Thomas had used the proceeds of illegal drug dealing to purchase the properties sought to be forfeited. Although the statements were hardly a significant part of the government's case, we think the district court again erred in failing even to consider them. The reason for this failure--that the statements did not detail the underlying factual circumstances upon which the conclusions were based (citing Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964))--has been explicitly rejected in Illinois v. Gates, 462 U.S. at 230-38, 103 S.Ct. at 2328-32.
 
 
 24
 An informant's statement may contribute to probable cause in connection with forfeiture proceedings, as in the Fourth Amendment context, if there is "substantial basis for crediting the hearsay." United States v. One 1974 Porsche 911-S, 682 F.2d 283, 286 (1st Cir.1982) (citing United States v. Ventresca, 380 U.S. 102, 108-11, 85 S.Ct. 741, 745-47, 13 L.Ed.2d 684 (1965)). The Court has not required that every statement of an informant include a detailed recitation of its basis. Gates, 462 U.S. at 233, 237-38, 103 S.Ct. at 2329, 2331-30. Rather, the "veracity" and "basis of knowledge" of persons supplying the information are to be considered within the totality of the circumstances at issue in determining probable cause. Id. at 238, 103 S.Ct. at 2332.
 
 
 25
 In particular, the Court has recognized the significance to the reliability determination of "corroboration of details of an informant's tip by independent police work." Id. at 241, 103 S.Ct. at 2333. Here many of the details contained in the statements of Livingston and Sturkin were corroborated by other evidence of Thomas' drug dealing. For example, Livingston's statement that Thomas made "two or three trips per month to Florida to purchase cocaine and marijuana" and that "he got caught at least three times" was corroborated by the records of plane flights and car rentals and by the Florida arrests and conviction for possession of significant quantities of marijuana. Similarly, Sturkin's statement that Thomas kept money in "a safe over the fireplace in his house at 2011 Church Street" was found to be substantially true. Detective Arthur testified that when the residence was seized in connection with this action, he found a hole "in the exact location that [Sturkin] had said there was a safe," that there "was an indentation for a safe," and "it appeared it had been there." He recovered $8,000 in cash from the opening.
 
 
 26
 Our real problem is not, however, with the district court's scrutiny of any single item of evidence, but with its general method of evidentiary assessment. The government fairly complains that the court engaged in a "divide and conquer" approach to its case, one that required each item of evidence to establish probable cause independently or be altogether disregarded. Parsing evidence in isolation for a fatal flaw threatens to transform the standard of "probable cause" into a steep threshold requirement that would impede the operation of the forfeiture statutes. "Circumstantial evidence of drug transactions is sufficient to support the establishment of probable cause in a forfeiture proceeding," $93,685.61 in United States Currency, 730 F.2d at 572, without showing a "direct connection between the property subject to seizure and the illegal activity that renders the items forfeitable." Edwards, 885 F.2d at 390. In its totality, the government's evidence strongly implicates Thomas in a scheme of smuggling drugs from Miami, Florida, to Charleston, South Carolina, and distributing them in Georgetown, South Carolina, at his place of business. Coupled with documentation that Thomas made large cash purchases far beyond any verifiable income, the evidence suggests that the money for these purchases was obtained through dealings with illegal drugs.
 
 
 27
 Thomas never rebutted the government's showing. The only explanation Thomas ever offered for his accretion of wealth was that he obtained the money through gambling. However, there was no testimony at trial concerning any gambling activities of Thomas except his uncorroborated assertions. In fact, Thomas conceded that he had no further documentation to offer as to proceeds derived from gambling or from any other source. There was never any explanation offered for his bizarre travel patterns to counter the obvious inference of drug trafficking. We conclude that the totality of the facts here demonstrate probable cause for the belief that the subject property was acquired with the proceeds of transactions in controlled substances and that claimants have not met their burden in rebuttal.
 
 
 28
 Accordingly, we reverse the judgment of the district court, and direct the court to enter an order of forfeiture of the properties at issue.
 
 
 29
 REVERSED.
 
 
 
 [1]
 The government argues that it was impossible for it to obtain records of the exact dates of Thomas' flights because such records were unavailable locally after twenty-four hours and could not be obtained from Piedmont's central computer after approximately ninety days