**The UNITED STATES of America**

v.

**ONE 1987 MERCEDES BENZ 300E, VIN: WDBEA30D6HA400110 VA TAG: MVI 688.**

**Civ. No. 92–1768–A.**

United States District Court, E.D. Virginia, Alexandria Division.

May 11, 1993.

---

Gordon D. Kromberg, Asst. U.S. Atty., Scott E. Ray, Sp. Asst. U.S. Atty., Alexandria, VA, for plaintiff.

Ludmilian Bengali, pro se.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This forfeiture dispute grows out of unusual facts and raises the question whether the former owner of a forfeited automobile can recover all or part of his equity in the automobile where, as here, the automobile was purchased in part with legitimate funds and in part with proceeds from an illegal extortion scheme. For the reasons that follow, the former owner's claim fails, and the government is entitled to summary judgment.

### II.

The essentially undisputed facts that led to the forfeiture are a fascinating reminder that fiction often pales in comparison to real life. Claimant, Ludmilian Bengali, is a Bulgarian, who in company with at least one other Bulgarian, concocted a scheme to extort money from Tosho Todorov Nedialkov, an expatriate Bulgarian living in this country since September 1991. Specifically, Nedialkov received a telephone call from Bengali, who falsely identified himself as "Giovanni," a member of a powerful Italian family who wished to speak to Nedialkov about a very important matter. Nedialkov agreed to an April 30, 1992 meeting. The day before this scheduled meeting, Nedialkov received a voice mail message at his home from Ventzislov Koutev, who spoke Bulgarian, and said it was vitally important that he meet with Nedialkov. They met that evening, at which time Koutev spun the following yarn: Koutev claimed to live in New York with another Bulgarian, who was the leader of a group organized for the purpose of tracking down

and punishing Bulgarians suspected of having stolen money from the former Bulgarian communist regime. Accordingly to Koutev, this group was "crazy," and Nedialkov should meet promptly with the person identified as "Giovanni" in order to avoid problems. The next day Nedialkov met with Bengali, who continued to masquerade as "Giovanni," and who then embellished the tale by telling Nedialkov that he was a member of a powerful Italian family and that his "boss," "John Gotti," had been offered $50,000 by the Bulgarian organization to kill Nedialkov. Bengali then made Nedialkov an offer he could hardly refuse: In exchange for 10% of Nedialkov's business and family assets [1], "Giovanni" and his "family" would agree not to carry out the Bulgarian organization's contract on Nedialkov's life, but instead would protect Nedialkov and his family. To cure any indecision or ambivalence on Nedialkov's part, Bengali reminded Nedialkov that no amount of money could replace Nedialkov's wife and daughters. And, in case Nedialkov thought he might be dealing with nice people, Bengali also told Nedialkov that the Bulgarian organization intended to plant cocaine in Nedialkov's house so that they could then tip off the DEA and have Nedialkov arrested, imprisoned and deported. Bengali gave Nedialkov until 5:00 p.m. that day to pay $20,000 down on the total amount demanded.

Nedialkov capitulated and drove Giovanni to the Business Bank in Vienna, Virginia, where Nedialkov unsuccessfully attempted to withdraw the $20,000. Nedialkov could do no better than a cashier's check, which Bengali refused because the bank would not agree to make the check out in blank. Thereafter, Nedialkov and Bengali drove to the Independence Federal Savings Bank in an attempt to make other arrangements. While nothing could be arranged that day, Nedialkov, with Bengali's consent, made arrangements to wire $15,000 from Independence Federal to Business Bank, which amount Nedialkov could then withdraw the next day. In any event, nothing could be done until the next day. In the meantime, Bengali told Nedialkov that he was under twenty-four hour surveillance, and that if he told anyone about these arrangements he was a dead man.

The next day, after making various arrangements, Nedialkov managed to marshal $18,000 in cash, which he handed over to Bengali. To satisfy the remainder of Bengali's extortion demand, Nedialkov ultimately succeeded in having the Business Bank issue a cashier's check in the name of "Ludmilian Bengali" for $55,000. He gave this check to Bengali. Thereafter, Bengali opened a checking account at Citizens Bank of Virginia. The opening deposit was the $55,000 check he had extorted from Nedialkov. No other deposits were made into Bengali's Citizens Bank checking account throughout the month of May.

Five days prior to opening the Citizens Bank account Bengali purchased a 1987 300E Mercedes Benz, VIN WDBEA30D6HA400110 from American Service Center for $22,000. He made a $9,000 cash down payment. He claims he made this payment with funds he received from his mother. Significantly, however, he made up the balance of the Mercedes's purchase price with a check in the amount of $12,901 drawn on his Citizens Bank account.

Not long thereafter, Bengali and Koutev were arrested and indicted in the Eastern District of Virginia. After a two day trial, both were convicted by a federal jury on charges of (i) extortion, in violation of 18 U.S.C. § 1951, and (ii) interstate transportation in aid of racketeering or in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952. Following his conviction, Bengali was sentenced to 70 months incarceration and Koutev to 55 months.

After his arrest and prior to his trial, Bengali admitted to an interviewing FBI agent that he used approximately $13,000 of funds extorted from Nedialkov to help pay for the Mercedes. At this same time, however, he adamantly insisted that the $9,000 cash down-payment came from untainted funds legitimately obtained from his mother. The government is more than a bit skeptical of this assertion, pointing out that it is at least equally plausible that the $9,000 cash down-

---

**1.** Apparently, Bengali thought this figure was at least $60,000.

payment came from one-half of the $18,000 Bengali had received from Nedialkov the day before the car purchase. Arguably, the source of the $9,000 cash down-payment is a disputed issue of material fact. Yet this dispute need not defeat summary disposition because Bengali's version of the facts is appropriately assumed to be true for the limited purpose of resolving the summary judgment motion. *See Paroline v. Unisys Corp.,* 879 F.2d 100, 102–3 (4th Cir.1989), *vacated on other grounds* 900 F.2d 27 (4th Cir.1990) (on motion for summary judgment, plaintiff's version of the facts must be presented where the parties' versions conflict, at least to the degree that the allegations have support in the record.); *see also Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### III.

█ Civil forfeiture principles are well established. First, 18 U.S.C. § 981(a)(1)(A) provides for forfeiture to the United States of:

> Any property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title, or any property traceable to such property.

Actions brought under § 981 are *in rem* and are prosecuted pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims. 18 U.S.C. § 981(b)(2). Since the action is *in rem* against the property, and not *in personam* against the owner, it is immaterial whether the persons whose misconduct gave rise to the forfeiture are indicted, charged, convicted or even acquitted of the predicate criminal conduct. *See United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984); *United States v. One Parcel of Real Estate,* 906 F.2d 110, 112 (4th Cir.1990). An important underlying principle is that forfei-

tures are not favored in the law and should be enforced only within both the letter and spirit of the governing provisions. *See United States v. One 1936 Model Ford V–8 De Luxe Coach,* 307 U.S. 219, 226, 59 S.Ct. 861, 864, 83 L.Ed. 1249 (1939).

█ In § 981 proceedings, the ultimate burden of proof is on the claimant. But the government also bears a burden. Initially, the government must show that there is probable cause to believe there is a connection between the property and the criminal activity in issue, namely money laundering in violation of § 1956 or § 1957.[2] If such a showing is made, the burden then shifts to the claimant to show by a preponderance of the evidence that the purchase of the defendant property was not a transaction prohibited by § 1956 or § 1957. *See United States v. Thomas,* 913 F.2d 1111, 1114 (4th Cir. 1990); *Boas v. Smith,* 786 F.2d 605, 609 (4th Cir.1986); *One Parcel of Real Estate, supra,* 906 F.2d at 111. If claimant fails in this burden, the government's probable cause showing suffices to support a judgment of forfeiture. *See Thomas, supra,* 913 F.2d at 1114. And probable cause in this context, as is true in the Fourth Amendment context, means a reasonable ground for the belief that goes beyond mere suspicion, but need not amount to *prima facie* proof. *See One Parcel of Real Estate, supra,* 906 F.2d at 112, *Thomas, supra,* 913 F.2d at 1114. In sum, the probable cause standard requires courts to make a practical, common sense decision whether, given all the circumstances, there is a fair probability that the property to be forfeited was involved in or the subject of a transaction that fits within § 1956 or § 1957. And in making this determination, Courts may consider and evaluate information that might be inadmissible hearsay in a trial. *See One Parcel of Real Estate,* 906 F.2d at 113; *United States v. Miscellaneous Jewelry,* 667 F.Supp. 232, 238 (D.Md.1987), *aff'd en banc*

---

**2.** This § 981 forfeiture action, like § 881 drug trafficking forfeitures, is required to proceed in accordance with the customs laws, 19 U.S.C. § 1602 *et seq. See* 18 U.S.C. § 881(d). Section 1615 of the customs laws, provides, in pertinent part, as follows:

> For purposes of this section, the provisions of the customs laws relating to the seizure,

summary and judicial forfeiture ... of property for violation of the customs laws ... (19 U.S.C. § 1602 et seq.), insofar as they are applicable and not inconsistent with the provisions of this section, shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under this section....

18 U.S.C. § 981(d). *See* 21 U.S.C. § 881(d).

*sub nom. One 1985 Nissan,* 889 F.2d 1317, 1320 (4th Cir.1989).

■ These principles, applied here, point persuasively to the conclusion that the defendant Mercedes is properly forfeited ·to the United States. To begin with, the record at bar provides more than ample probable cause to conclude .that the $12,901 Citizens Bank check Bengali gave American Service Center for the balance of the Mercedes purchase price· is directly .traceable to the $55,000 deposit he made to his account, and, further, that this $55,000 deposit was the cashier's check he extorted from Nedialkov in violation of 18 U.S.C. §§ 1951 and 1952, for which he was convicted by a jury.

These facts place the Mercedes squarely within § 981(a)(1), the civil forfeiture statute, which, it will be recalled, provides for forfeiture of any property involved in a violation of § 1956 or § 1957. Section 1956, *inter alia,* prohibits knowingly conducting a financial transaction involving proceeds of "specified unlawful activity" for the purpose of concealing the nature of those proceeds. This is precisely what Bengali did, for Section 1956(c)(7), referring to § 1961, defines "specified unlawful activity" to include extortion (§ 1951) and interstate travel in aid of racketeering (§ 1952). Thus, Bengali's use of extortion proceeds in purchasing the Mercedes renders the purchase a prohibited transaction under § 1956. The same result obtains under § 1957, which, *inter alia,* prohibits monetary transactions "in criminally derived property that is of a value greater than $10,-000 and is derived from specified unlawful activity." This, too, precisely describes Bengali's purchase of the Mercedes, as its value is greater than $10,000 and its purchase was derived from specified unlawful activity, namely extortion. In sum, the Mercedes is subject to civil forfeiture because the record makes clear that Bengali, the wrongdoer, purchased the Mercedes in part with proceeds derived from violations of § 1951 and § 1952 and, as such, the purchase was a prohibited transaction under § 1956 and § 1957.[3]

Bengali makes two arguments in an effort to avoid forfeiture. First, he argues that he is entitled to the return of the $9,000 cash down payment he insists came from his mother, a legitimate source. This argument fails because the forfeiture is triggered not by the extortion itself, but by the purchase of the vehicle, which was a prohibited money laundering activity. Thus, it is the entire vehicle that was involved in the money laundering transaction, not merely the funds traceable to the extortion. And it is therefore the entire vehicle that is subject to forfeiture. It often happens that wrongdoers knowingly commingle legitimate funds with property obtained through a specified unlawful activity. Indeed, wrongdoers often use the cover afforded by commingled legitimate funds to facilitate the laundering offense. When, as here, such commingling occurs, the entire property, including the legitimate funds, is subject to forfeiture. Other courts have reached this same, sensible result. In the words of the Eleventh Circuit:

> As to a wrongdoer, any amount of the invested proceeds traceable to drug proceeds forfeits the entire property. We have never held that as to a wrongdoer only the funds traceable to illegal activities may be forfeited. If one is an innocent owner, no amount of that person's or entity's funds are forfeitable. On the other hand, if one is a wrongdoer, the full value of the ... property is forfeitable because some of the funds invested are traceable as the statute dictates.

*United States v. One Single Family Residence Located at 15603 85th Avenue,* 933 F.2d 976, 981–82 .(11th Cir.1991); *see also United States v. Santoro,* 866 F.2d 1538, 1542 (4th Cir.1989) (holding to be forfeitable all property connected with the facilitation of illegal activity); *United States v. All Monies*

---

**3.** A different result may obtain when illegitimate and legitimate funds are commingled not by a wrongdoer, but by an innocent purchaser or owner who can establish that she had no knowledge of the underlying criminal activity from which the illegitimate funds were derived. *See* 18 U.S.C. § 981(a)(2) (providing for "innocent owner" defense). *Cf. U.S. v. All Monies in Account No. 90–3617–3,* 754 F.Supp. 1467, 1476–78 (D.Hawaii 1991) (innocent owner can prevent forfeiture of funds in bank account used to launder money by, *inter alia,* establishing lack of knowledge of illegal activity).

*In Account No. 90–3617–3,* 754 F.Supp. 1467, 1473 (D.Hawaii 1991) (same). The simple lesson of the statutes· and the decisions construing them is that wrongdoers cannot. shield from forfeiture any legitimate funds commingled with tainted funds. Thus, by using the Mercedes purchase as a means of laundering the proceeds of his extortion, Bengali subjected to. forfeiture any legitimate funds also involved in the purchase transaction.

Finally, Bengali argues that he never received $18,000 in cash from Nedialkov. This contention is immaterial here for the $18,000 extortion payment plays no role in the forfeiture of the Mercedes. It is the $55,000 extortion payment that furnished the money for the $12,901 check Bengali used to pay the balance of the purchase price. Beyond this, however, Bengali's contention that he never received $18,000 from Nedialkof is foreclosed by the jury verdict. Count 3 of the indictment charged Bengali with extorting $18,000 from Nedialkov on May 1, 1992. The jury convicted him on this count. Necessary and essential to conviction on this count was the jury's finding of fact that Bengali received the $18,000 payment from Nedialkov. It follows that Bengali may not here contest that fact. The doctrine of issue preclusion or collateral estoppel bars Bengali's attempt to relitigate in this civil proceeding an issue of fact fully litigated in a prior criminal proceeding and necessary and essential to the judgment of conviction entered in the criminal matter. *See,· e.g., Brooks v. Arlington Hosp. Ass'n,* 850 F.2d 191, 196 (4th Cir.1988); *United States v. Wight,* 839 F.2d 193 (4th Cir.1987); *Emich Motors· Corp. v. General Motors Corp.,* 340 U.S. 558, 568, 71 S.Ct. 408, 413, 95 L.Ed. 534 (1951); *United States v. Moore,* 765 F.Supp. 1251, 1255 (E.D.Va.1991), *aff'd in part and rev'd in part,* 974 F.2d 1333 (4th Cir.1992).

## IV.

Because no material fact remains in dispute, this matter is ripe for summary disposition. Rule 56, Fed.R.Civ.P. And because the undisputed record facts make clear that the defendant Mercedes is properly forfeited under § 981, the government is entitled to summary judgment. Counsel for the government is directed to submit an appropriate judgment order to the Court.