**UNITED STATES of America, Plaintiff,**

v.

**ANY AND ALL ASSETS OF THAT CERTAIN BUSINESS KNOWN AS SHANE COMPANY, etc., et al., Defendants.**

No. 6:91CV00338.

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

Sept. 6, 1991.

---

ner, Gardner & Johnson, Mount Airy, NC, for Grady Jacob Mitchell.

Carroll F. Gardner, Gardner, Gardner & Johnson, Mount Airy, NC, Seth R. Cohen, Smith, Follin & James, Greensboro, NC, for Brian K. Thomas.

Larry Grant Reavis, Larry Talmadge Brown, Reavis, Thomas, Poole & Brown, Winston–Salem, NC, for Wilburn Carson Shumate.

James A. Cole, Jr., Jonathan W. Biggs, Stubbs, Cole, Breedlove, Prentis & Biggs, Durham, NC, for Central Carolina Bank & Trust Co.

Benjamin F. Davis, Jr., Smith Helms Mulliss & Moore, Greensboro, NC, Stephen Douglas Poe, Bell, Davis & Pitt, P.A., Winston–Salem, NC, for NATIONSBANK.

Michael E. Ray, Kurt Christopher Stakeman and Eric Cole Morgan, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for Paccar Financial Corp.

Fredrick G. Johnson, Johnson, Bell & Rives, Dobson, NC, for Workmen's Federal Sav. Bank, Southern Nat. Bank of North Carolina.

Marc L. Isaacson, Isaacson & Isaacson, Greensboro, NC, Dennis L. Guthrie, Murchison, Guthrie, Davis & Henderson, Charlotte, NC, Lawrence J. Friedman, Lloyd Ward, Friedman & Associates, Dallas, TX, for Associates Commercial Corp.

Surry Orthopaedic Associates, P.A., pro se.

Thomas W. Anderson, Pilot Mountain, NC, for Susan Dobbins.

H. Lee Merritt, Jr., Folger and Folger, Mount Airy, NC, Richard J. Keshian, Elizabeth L. Moore, Petree Stockton, Winston–Salem, NC, for Community Bank.

Greenbrier Villas Condominium Ass'n, Inc., pro se.

Roger Webb, pro se.

M. Slate Tuttle, Jr., Williams, Boger, Grady, Davis & Tuttle, P.A., Kannapolis, NC, for C K Federal Sav. Bank.

John Lawler Hash, King, NC, for Anthony Layne Creed dba J & L Const.

U.S. Atty., M.D.N.C., Greensboro, NC, for U.S.

Norman B. Smith, Margaret Rowlett, Seth R. Cohen, Smith, Follin & James, Greensboro, NC, for Shane Co.

Norman B. Smith and Margaret Rowlett, Smith, Follin & James, Greensboro, NC, for Property, Elkin, N.C., Property, Condominiums, Mt. Airy, N.C., Property, Condominiums, Concord, N.C.

Internal Revenue Service, pro se.

Norman B. Smith, Margaret Rowlett and Seth R. Cohen, Smith, Follin & James, Greensboro, NC, Carroll F. Gardner, Gard-

## MEMORANDUM OPINION

ELIASON, United States Magistrate Judge.

### Introduction

This case is before the Court on claimants' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). On July 9, 1991, the United States of America filed a complaint for forfeiture *in rem* against all the assets of Shane Company as well as other related properties. The complaint alleged that Shane Company was used to facilitate drug transactions and money laundering. 18 U.S.C. §§ 981; 1956(a)(1); 1957. A warrant for the arrest of the properties and notice *in rem* were issued on July 10, 1991, and the property was seized on July 11, 1991. Claimants Grady Jacob Mitchell and Brian Keith Thomas filed claims for relief from forfeiture of the property on July 22, 1991. Claimants filed their motion for a preliminary injunction on July 31, 1991, twenty days after the property was seized. Claimants assert that without immediate injunctive relief they will be unable to restart the business even if they prevail in the litigation.

All parties have consented to proceed before a magistrate judge, as provided by 28 U.S.C. § 636(c), for ruling on this motion. After considering the testimony adduced at the hearing held on August 9, 1991 and continued over to August 28, 1991 in order for the parties to present accounting experts, and all pleadings and filings in this case, the Court makes the following findings of fact.

### Findings of Fact

1. On July 10, 1991, the undersigned issued a warrant for arrest and seizure of the real and personal property ostensibly held by Brian Keith Thomas, d/b/a Shane Company. Shane Company is a trucking company. This seizure was predicated on evidence presented in affidavits by the government. The affidavits disclosed that Grady Mitchell, the true owner of Shane Company, and the nominal owner, Brian Keith Thomas, used Shane Company in order to conduct marijuana and cocaine sales and distribution and laundered the drug money through the company. Thereafter, the Honorable P. Trevor Sharp issued search warrants for trailers and vehicles on Shane Company premises. Agents had found evidence of stolen trucks, trailers and their parts on the Shane Company's premises, evidenced by alteration of vehicle and parts identification numbers. These warrants issued July 25 and August 5, 1991.

2. What is now known as the Shane Company was founded by Grady Mitchell, a lifelong resident of Surry County, North Carolina. Mr. Mitchell began trucking in 1974 by purchasing one truck and leasing it. At that time, the company was known as Mitchell Trucking Company. The property on which the company operated was in Mitchell's name. Around 1983, the real property was deeded to his brother George Anthony Mitchell. This was done in order to help Grady Mitchell prevent the Internal Revenue Service and his creditors from obtaining the property.

3. In the early 1980's, Grady Mitchell was convicted in state court for receiving and possessing stolen vehicle parts in Surry County. The business by that time had grown to twelve to fifteen trucks. Mitchell received a 15–month state sentence. Also, some time between 1980 and 1982, Mitchell was convicted in this federal court for receiving and possessing stolen truck parts. He was given a 30–month sentence. He began to serve this sentence in 1985.

4. At some time when Grady Mitchell was in federal prison, he decided to change the name of his company and titled it in the name of his son-in-law Brian Keith Thomas. (Mitchell had employed Thomas in 1983 and Thomas married Mitchell's daughter Freddie Mitchell in 1985.) Thomas gave Mitchell nothing for the business. The reason for the name change and alleged transfer of assets was so Mitchell could again avoid financial problems with his creditors and also because of his "marital or wife" problems. In other words, Mitchell did this to avoid his creditors obtaining the property or his wife obtaining the property as part of the division of the marital assets, alimony and/or child support.

5. In 1986, after Grady Mitchell left federal prison, Shane Company had very little assets. The six tractor trailer units it had were old. However, by the time of the sei-

zure in 1991, the company had grown to about twenty-one tractor units and thirty-two trailer units. Approximately fourteen of the tractor units were new. Most of the trailer units are three to four years old.

6. The true owner of Shane Company cannot be precisely determined. The title of the property is listed in the name of Brian Keith Thomas. However, Grady Mitchell considers himself to be the true owner of the company. He makes all of the decisions in the company with respect to buying property, including buying condominiums and cars for his own use, and only consults with Thomas by telling him that these decisions will be made. Grady Mitchell works in the front office with the bookkeeper. He controls the company, procures the business, dispatches the trucks and makes all major decisions. Even after the alleged transfer of ownership to him, Brian Keith Thomas remains in his position as a mechanic with the company. Thomas testified that he owned the company. However, it is clear that he is nothing more than the nominal owner and takes his direction from Grady Mitchell. He is paid a salary of approximately $500.00 a week. Grady Mitchell is not paid a salary but has the company buy expensive automobiles for his use, such as Porsches, and had the company buy the condominium in which he lives. Notwithstanding, Brian Keith Thomas files Schedule C with his federal income tax return indicating that Shane Company is a proprietorship owned by him and that he is responsible for the taxes.

7. Grady Mitchell operates Shane Company in the name of Brian Keith Thomas to avoid his legal obligations. In addition, he disregards the Shane Company proprietorship entity. Thus, Grady Mitchell testified that he took money from Shane Company in order to purchase Certificates of Deposit (CD's) in his mother's name. At other times he would have his mother obtain a loan on the CD's and transfer the money to Shane Company. He instructed the mother to report the interest on the money for the CD's and if the additional amount made it so that she had to "pay above the form" so that she had increased tax liability, Shane Company would repay her for the amount of the extra taxes. At the time of seizure, there appeared to be more than $300,000.00 in CD's. Grady Mitchell took these actions knowing that the interest would not be reported on Shane Company's books. There has not been advanced a legitimate satisfactory explanation for the ruse.

8. As further evidence of using Shane Company as a ruse, Grady Mitchell kept large amounts of cash at the Shane Company office. At the time of the seizure, over $60,000.00 of unaccounted cash was found at the office in a sack. There was also money in a cash drawer. Mitchell required the drivers to cash their expense checks in the amounts of $200.00 to $400.00 with him. He would give the drivers cash and take the checks which were signed over to him. At the hearing on August 8, 1991, Mitchell claimed that he used these checks to buy the Certificates of Deposit. The cash drawer at the time of the seizure contained $26,000.00 in uncashed advance checks. On the other hand, Grady Mitchell told claimants' expert accountant witness Steve Tilley that he used federal fuel tax refund checks to purchase the CD's. Cecil Williams, Special Agent of the Internal Revenue Service, indicated that some of the CD's were purchased with cash. The Court concludes that there is a serious question that the CD's may have been purchased with funds obtained from illegal means.

9. Grady Mitchell failed to report Shane Company assets to the company bookkeeper. He did not submit federal fuel tax refund checks to his bookkeeper so that they could be put on Shane Company's books. He used such funds as personal property belonging to him. Mitchell told Brian Keith Thomas that the money for the CD's came from fuel tax refunds and insurance claims. However, Mitchell failed to report either the tax refunds, insurance checks or CD's to the bookkeeper.

10. Brian Keith Thomas kept property in his name so that Grady Mitchell would not have any title to property in his name. Thus, Mitchell selected and purchased the Cross Creek Country Club condominium so that Mitchell could live there. Thomas knew nothing of the transaction but had Shane Company buy the property so that Mitchell

would not appear to have any ownership interest in his name. The same scenario was reflected for the Porsches and Mercedes and other automobiles owned by Shane Company.

11. The government has presented affidavits establishing probable cause that Grady Mitchell and Brian Keith Thomas (under Mitchell's direction) have used Shane Company property to transport marijuana and cocaine to North Carolina on Shane Company trucks. In addition, the affidavits indicate that proceeds from the drug business have been laundered through Shane Company.

12. The various searches and seizures of the Shane Company premises reflect a number of stolen truck vehicles and/or parts where serial numbers have been removed and restamped. Mitchell and Thomas necessarily must have known about this and condoned the activity. The evidence shows that a not insignificant part of Shane Company was built on stolen vehicles and parts. Grady Mitchell attempted to indicate that restamping occurred by government officials back in the early 1980's when he was charged with receiving stolen truck parts. However, some of the property clearly comes from vehicles and parts post-dating that time period and, therefore, that explanation is not believable. Brian Keith Thomas refused to answer questions concerning stolen truck parts and property on the grounds that such answers might tend to incriminate him. The government presented substantial evidence that a red tractor cab stolen in Alabama around 1986 or 1987 was found on Shane Company property in plain view. Neither Mitchell nor Thomas could provide a satisfactory explanation as to why such a visible object could be on their property without their knowledge. Identifying numbers had been removed. In addition, property identified as being stolen in Statesville, North Carolina, in 1984 and engines stolen in High Point, North Carolina, in 1989 have been verified. Other parts, including transmissions, sleeper cabs and chassis have the serial numbers removed and/or restamped. Also, there are engine plates where identification numbers have been cut out. Even though a large number of Shane Company truck tractors are new, this does not preclude the possibility that other stolen tractors and/or parts were traded in to provide the new vehicles and there is probable cause to believe that such may have indeed occurred.

13. The July, 1991 seizure of the Shane Company property did not locate significant amounts of drugs. There were trace amounts of drugs found at Mitchell's residence (the Shane Company condominium) and in his office. However, a drug dog alerted to the bag of money containing over $62,000.00 found in his office. Also, there were several bags with tape on them, suitable for wrapping larger amounts of drugs, to which the drug dog alerted. In Mitchell's office there was a brown bag with plastic and duct tape that had green vegetable matter in it. There was a small mirror with a razor blade and a hollow pen which had a white residue on it. There was drug residue in Thomas' office, storage bins and a Shane truck. These findings, while not proof in themselves of large scale drug dealing, corroborate the seizure affidavits which do so indicate.

14. The manner in which Shane Company keeps records and meets it legal obligations can, at best and most charitably, be described as very negligent. Thus, the company calls its drivers independent operators when they clearly are employees. The company has not paid its share of the Social Security–FICA tax for the years of its operation. As previously discussed, Grady Mitchell treats the company as his personal property. The company can only be considered a viable one by acknowledging the extensive improprieties in its operation. *See* Claimants' Exhibit 11. Thus, in order to show that it operated with any profit, its accountant expert at the hearing (Steven Tilley) had to assume that Shane Company failed to report insurance checks and federal fuel tax refunds as income. By including these amounts as income, the company would show a slight profit under his calculations. However, these items were never given to the bookkeeper and it appears that Grady Mitchell treated these checks as his personal property.

15. Shane Company enjoyed an enormous growth from 1986 through 1990. The gross

receipts from 1987 through 1990 grew at 19% which is well above the average for the trucking industry. In addition, the company was able to rely less on brokers which charge a percentage for finding the business. Now the company has its own line of customers which deal directly with the company. Some of the important customers would continue to use Shane Company if the Court permitted the company to open up under a trusteeship.

16. There is a serious question of whether the growth of Shane Company came entirely from legitimate customers. Both the government's and claimants' expert examined the year 1990 to see if Shane Company's gross receipts came from legitimate sources. Claimants' expert, Mr. Tilley, performed a calculation for the month of October, 1990 using actual drivers' logs and trips made. Using predicted revenues from such trips, he determined by extrapolation that, within 2%, the revenue claimed by Shane Company in 1990 came from customers. The government's expert, on the other hand, found significant discrepancies in Shane Company's records and, therefore, found large amounts of unexplained items and receipts which could have come from an unexplained cash source. For example, IRS Form 1099, required to be submitted by the customers for funds paid to Shane Company, did not match up with the receipts. Also, there were large amounts of receipts which could not be tied to any billing invoices. (However, an audit had not been performed so it could not be determined that in fact all of the receipts did not come from customers.) Moreover, looking at the profit and loss figures from 1986–1990, it was his opinion that the Shane Company growth could not have come solely from revenues. Government's Exhibit 10, p. 14.

17. The profit and loss picture of Shane Company indicates that it is not a profitable venture and that it is losing money. The Shane Company will likely have additional tax liabilities not reported or paid to the government. The government's expert, Mr. Barker, showed that after employing proper accounting procedures and taking into account only the additional one-half FICA tax due, that instead of having a $27,000.00 profit for 1990, the company would have a $239,-000.00 loss. Government's Exhibit 10, p. 5. This same accounting would likely also produce similar losses for 1986, 1987, 1988 and 1989. With respect to 1991, there was a slight profit of $75,000.00 for the first six months, but Mr. Barker indicated that not all of the receipts are in.

Mr. Tilley, claimants' expert, on the other hand, emphasized a cash flow analysis and found that there was significant cash flow in the company which would justify its continued existence. However, Mr. Tilley's figures are based on information he obtained from Grady Mitchell. In particular, the opinion is premised on Mr. Mitchell's explanation that all of the fuel tax refund proceeds were used to buy Certificates of Deposit and that the fuel tax proceeds had previously been expenses and, therefore, could be included as income. This fact was not determined or verified. Moreover, Grady Mitchell testified somewhat to the contrary that he also used employees' expense checks to buy CD's and Agent Williams testified that some or parts of the CD's were purchased with cash sources as well. Therefore, the Court discounts this assumption. With respect to insurance proceeds which Mr. Tilley also used to predict a positive cash flow, Tilley assumed that the proceeds were for truck accidents and not damage to shipped products. The latter would have to be refunded to customers. Tilley further assumed that there would be little or no expenses offsetting the insurance checks or that the expenses had already been offset. Therefore, this figure is not entirely reliable. In addition, Mr. Tilley did not include the additional federal and state income taxes, FICA taxes, and state unemployment taxes. Mr. Tilley's calculations failed to take into account an adjustment to basis in the purchase of new trucks in 1989–90 in the amount of $5,000.00–$24,000.00 per truck which would increase depreciation and show decreased profitability. Notwithstanding these deficiencies, the Court finds that although the company does not appear to be profitable, it does appear to have a significant cash flow, in addition to that derived from unexplained or illegal means, and that even though the company likely is operating at a loss, other companies

have also operated at a loss for a number of years.

18. Shane Company is a marginal to ineffective company. Its revenues per mile are one-half of the industry average and its gross revenues are well below what would be expected from such a company. *See* Government's Exhibit 10, p. 4. The figures are corroborated by Mr. Tilley's analysis when he compared two local companies' revenues per trip to Shane Company's revenues. These companies appeared to make significantly more money per trip than Shane. ($5,900.00–$7,100.00 versus $5,500.00.) Therefore, even though Shane Company had recently purchased a large number of vehicles which are energy efficient and now has a stable number of respectable customers who would continue to do business with it, the Court finds that Shane Company is not very efficient, has sustained substantial losses and will continue to do so. In addition substantial tax liability has accrued from past years which must be paid. All of this leads to a very gloomy picture of survival for the company without obtaining protection from bankruptcy or an infusion of cash.

19. The Court finds, based on Mr. Barker's testimony, that serious questions exist concerning the growth, the assets and net worth of Shane Company from 1986 which cannot be explained as all coming from legitimate sources. Using Shane Company's records and figures, Mr. Barker determined that growth and net worth of the company simply could not be explained by the low profit and sometimes losses reported by the company. Mitchell and Thomas did not have legitimate financial resources to account for any cash infusion. For the year 1990, Mr. Barker could not identify all deposits made to the bank and approximately one-half million dollars could not be tied to customer receipts. In 1991, approximately $300,000.00 could not be tied to customer receipts. He further found that while Shane Company's gross income was increasing, the net profit as a percentage of income was decreasing. While admittedly an audit has not been conducted, Shane records are so poorly kept that an audit would be very difficult or impossible. The Court accepts this analysis over Mr. Tilley's analysis which contained deficiencies and unreliable presumptions that have previously been discussed.

The Court further finds that neither accountant took into account the fact that there may be significant stolen property used by Shane Company to repair and replace its trucks and that upon being deprived of this source of non-reported assets, Shane Company would be less profitable.

20. The approximate value of Shane Company's assets is over $1.5 million and it has a net book value of about that amount. The company has a going concern value of between $1,250,000.00 to $1,400,000.00. In a liquidation situation, the company could expect to receive from $750,000.00 to $900,-000.00. Thus, the loss on selling the company as a going concern compared to selling it on liquidation is approximately $350,000.00 to $650,000.00.

21. Utilizing current records, which appear to be incomplete, and ignoring substantial federal and state tax liability, the company appears to have a net worth of $400,000.00 to $700,000.00.

22. Claimants stipulated in open court and the Court finds that they are unable to post any bond to support a preliminary injunction permitting Shane Company to resume operations. In addition, Grady Mitchell and Brian Keith Thomas would be central to the profitable operation of the company.

23. Mitchell and Thomas would be less than suitable operators because they have run Shane Company as a sham business operation and used it for their personal purposes in disregard of legal and business formalities. The parties have not informed the Court of the cost of a full time trustee who would have full responsibility for running Shane Company.

24. In order to protect the government's property traveling out of this district, claimants would agree to put a lien on all rolling stock of the company.

*Law*

A. *Propriety of Preliminary Injunction in Civil Forfeiture Action*

Because of the unusual nature of a forfeiture action, it may at first blush seem

peculiar for a claimant of seized property to request preliminary relief. Forfeiture actions are different than other civil actions. First, the dearth of procedural safeguards calls attention to itself and creates its own unease. *See U.S. v. One 1985 Mercedes,* 917 F.2d 415, 420 (9th Cir.1990). In traditional civil cases, there would be a right to an immediate post-deprivation hearing. *Id.* This is not so for forfeiture cases. *Id.* In civil forfeiture actions such as the instant one, it is the property or object itself which is considered to be the offender. *Id.* at 419. Claimants such as the instant ones are viewed as nothing more than interested intervenors. *Id.* Even though the action involves alleged violation of the criminal law, the owner-claimant is not protected by those rights normally due criminal defendants but must be satisfied with the protection of the civil law. *Id.*

■ Guilt or innocence of the owner-claimant is largely irrelevant. *Id.* Thus, forfeiture actions may proceed against the property even though the owner claimant has not been charged with the related criminal offense or even if he has been acquitted. *U.S. v. Land and Bldg. at 2 Burditt Street,* 924 F.2d 383 (1st Cir.1991).

■ Another unusual aspect of forfeiture proceedings is the minimal burden which the government must shoulder in order to establish cause for forfeiture. The government need only establish probable cause that there is a substantial connection between the property which is to be forfeited and the criminal activity. *U.S. v. Thomas,* 913 F.2d 1111 (4th Cir.1990). Probable cause is the same as used in search and seizure cases and includes hearsay evidence. A direct connection between the illegal activity and the property need not be shown. Instead, it is sufficient to show through circumstantial evidence that the property was used or obtained through illegal activity. Once probable cause is established, the burden shifts to the claimant to show by a preponderance of the evidence that the property was not acquired in violation of the law or otherwise linked to illegal activity. *Id.*

■ The sweep of the forfeiture laws is broad. Thus, the whole of the property may be forfeited even though only a portion was used for illegal purposes. *Burditt Street,* 924 F.2d at 385. For example, forfeiture may encompass not only property directly involved in the wrongdoing, but also property used to facilitate criminal offenses or connected to the tainted property. *U.S. v. All Monies ($477,048.62) in Acc. 90–3617–3,* 754 F.Supp. 1467 (D. Hawaii 1991) (all of the bank accounts); *U.S. v. Real Property and Residence,* 921 F.2d 1551 (11th Cir.1991) (house and property forfeitable even though only driveway used to facilitate narcotics transaction); *Burditt Street,* 924 F.2d at 386 (improvements to property made after offending act may be forfeitable).

■ Notwithstanding the apparent draconian sweep of drug forfeiture laws, the owner-claimant is not without remedies. Even though an immediate post-deprivation probable cause hearing is not required, the owner-claimant is not unprotected against significant harm which may arise from the seizure. Where the owner faces significant and irreparable harm resulting from the seizure, his remedy is to move the district court for a preliminary injunction. *United States v. One Parcel of Real Property,* 767 F.2d 1495 (11th Cir.1985); *see also U.S. v. Roth,* 912 F.2d 1131 (9th Cir.1990) (in the obverse situation, a district court's pretrial order issued in a criminal case restraining use of assets is treated as a preliminary injunction motion requested by the government).

An example of applying preliminary injunction principles to a forfeiture action may be seen in *Application of Kingsley,* 802 F.2d 571 (1st Cir.1986). In that case, the district court issued a preliminary injunction returning the use of the contents of a house to a claimant. The claimant already had use of the house through an agreement with the United States Marshal and, therefore, a preliminary injunction as to the house itself was not necessary. With respect to the personal property, the district court found that the government had not shown probable cause for the seizure of the contents of the home and other issues. Therefore, the court issued a preliminary injunction. Even though

the district court found lack of probable cause for the seizure, it still required a $28,-000.00 bond because there still remained a possibility of forfeiture and loss to the government. Also, it appeared that the claimant agreed to a bond. In these circumstances, the harm to the petitioner of not having any of his assets outweighed the potential harm to the government which had a bond protecting it.

■ In requesting a preliminary injunction in a forfeiture case, the claimant still must establish irreparable injury and that his remedy at law is inadequate. *U.S. v. Mosquera,* 695 F.Supp. 1353, 1357 (D.Mass.1988). When the seizure only involves an item of personal property such as a car, irreparable harm may be very difficult to demonstrate. *Id.* On the other hand, when the seizure and forfeiture involves a business, it is likely that the government must make some satisfactory arrangements to continue the business, particularly if life or perishable property is at stake (*see e.g. U.S. v. D.K.G. Appaloosas, Inc.,* 829 F.2d 532 (5th Cir.1987), *cert. denied,* 485 U.S. 976, 108 S.Ct. 1270, 99 L.Ed.2d 481 (1988) (continued operation of horse ranch during forfeiture proceedings)). A business is different than a mere asset. It has an intangibility or life of its own. Thus, when a business is seized, it may be proper to require the continued operation of the business *pendente lite* if seizing all of the assets would create irreparable harm by destroying the business. *See e.g. One Parcel of Real Property,* 767 F.2d at 1496 n. 2 (district court entered an order substituting the wife of one of the restaurant owners as custodian of the property but prohibited any transfer of interest in property without court order). In a related context, the criminal forfeiture statutes permit the Court to appoint a trustee if necessary. 18 U.S.C. § 1963(e); 21 U.S.C. § 853(g). It would appear the same could be utilized in a civil forfeiture case if necessary.

### B. Applicable Standard for Preliminary Injunction

■ It hardly needs to be repeated that a preliminary injunction is an extraordinary remedy which should only be granted if the moving party clearly establishes an entitle-ment to such relief. *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 499 (4th Cir.1981). "[I]n this circuit the trial court standard for interlocutory injunctive relief is the balance-of-hardship test." *Blackwelder Furn. Co., Inc. v. Seilig Mfg. Co., Inc.,* 550 F.2d 189, 196 (4th Cir.1977).

The balance-of-hardship test "requires a 'flexible interplay' among four factors: the likelihood of irreparable harm to the [moving party] if the preliminary injunction is denied; the likelihood of harm to the [opposing party] if the request is granted, the likelihood that the [moving party] will succeed on the merits; and the public interest." *Federal Leasing,* 650 F.2d at 499. Also, "[t]he balance-of-hardship test ... emphasizes that, where *serious* issues are before the court, it is a sound idea to maintain the *status quo ante litem,* provided that it can be done without imposing too excessive an interim burden upon the [non-moving party]." *Blackwelder,* 550 F.2d at 195.

Maintenance of the status quo is an important consideration in the prevention of irreparable harm. *Federal Leasing,* 650 F.2d at 499. In an ordinary case, the maintenance of the status quo would require that a business be allowed to continue operating. The purpose behind this would be to prevent irreparable harm and enable the Court to render appropriate relief at the conclusion of the litigation. *Id.* In the context of a civil forfeiture case, this principle is somewhat conflicting because there is a tension between the two purposes for maintaining the status quo. The claimants contend they will be irreparably harmed without the injunction, and the government contends that, without a bond, allowing the business to continue will lessen the value of the assets, thus inhibiting the Court's ability to "render complete relief." *Id.*

■ Of the four factors to be considered, the possibility of irreparable harm to the moving party and the harm to the opposing party are the "two most important factors." *Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991). However, the Court must consider all four factors, and "[t]he weight to be given each factor varies according to the circumstances of each case."

*James A. Merritt and Sons v. Marsh*, 791 F.2d 328, 329 (4th Cir.1986).

### Irreparable Harm to Claimants

In this case, the claimants contend that a preliminary injunction is necessary for the continued viability of their business. Claimants state that Shane Company cannot be salvaged as a business if it is not allowed to continue operation within 4–6 weeks from the date of the seizure.[1] They claim Shane Company will be unable to meet the demands of its creditors, thirty to thirty-five drivers will be forced to find work elsewhere, and the company's customers will be lost to competitors. In short, Shane Company will go out of business. In the ordinary situation, as in *Federal Leasing* the risk that a business will cease to exist weighs heavily in favor of finding irreparable harm. Also, like the plaintiff in *Federal Leasing*, even if claimants' company "were to survive, the continuation of its present predicament endangers its relations with customers ..., [and] the good will built up by a heretofore successful enterprise." 650 F.2d at 500.

The government counters claimants' argument by insisting that Shane Company is not a legitimate business, and is merely a sham company which would not be profitable without illegal resources. Therefore, the government contends that the loss of claimants' sham company would not constitute irreparable harm.

### Harm to the Government

The government asserts that it will suffer harm if the assets of the company, primarily trucks, are allowed to leave the district and jurisdiction over those assets is lost. Also, the government argues that Shane Company cannot not operate "in the black" as a legitimate business, and thus any continued operation of the company will depreciate the overall worth of the assets which were seized.

Claimants counter that a court-appointed trustee, to be paid from the receipts of the company, could manage the business and assure the government that the assets of the company would not be diminished. Claim-

ants have also stated that they would be willing to grant liens in favor of the government to prevent the transfer of the tractors and trailers which would be taken out of the district. Finally, claimants have stated that they are not financially able to post a meaningful security bond.

### Likelihood of Success

The moving party's burden to show success on the merits is based on a sliding scale. Failure to prevail on the balance of harms requires a strong showing of probable success on the merits before the Court will grant an injunction. *Murrow Furniture Galleries v. Thomasville Furniture Industries, Inc.*, 889 F.2d 524 (4th Cir.1989). On the other hand, if the moving party prevails on the balance of harms, "it is enough that grave or serious questions are presented; and [the moving party] need not show a likelihood of success." *Blackwelder*, 550 F.2d at 196.

### Public Interest

There is public interest in the continuation of legitimate businesses and their generation of tax revenue, employment and their general contribution to the economy. However, the public interest is most strongly served by the enforcement of the law. *Murrow Furniture Galleries*, 889 F.2d at 529 (enforcement of anti-trust laws serves the public interest). Forfeiture of property under 18 U.S.C. § 981, which is "derived from or traceable" to proceeds from an illegal drug business or money laundering, serves a significant public interest. The public interest is also served by the termination of ongoing illegal enterprises.

### C. Unclean Hands

When the Court considers a motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a), the Court sits as a court of equity. The government asserts that the claimants should be barred from obtaining injunctive relief by the maxim "he who comes into equity must come with clean hands." 2 Pomeroy, EQUITY JURISDICTION § 363 (5th ed.

---

1. The Court notes that claimants waited nearly three weeks before seeking the injunction.

1941). The maxim is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Smith v. Cessna Aircraft Co.* 124 F.R.D. 103 (D.Md. 1989) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–815, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)). The court applies the clean hands doctrine, "not for the protection of the parties, but for its own protection." *Mas v. Coca-Cola Co.*, 163 F.2d 505, 507 (4th Cir.1947).

Although this Court is not refusing at this point to consider the claimants' request for an injunction, it must be noted that the government has made a substantial showing that the claimants hands are unclean with respect to the business of Shane Company. The evidence of unclean hands will weigh heavily in the Court's analysis of the *Blackwelder* factors, particularly the balancing of harms and the public interest.

### D. Discussion

 The starting point for discussing this case should be that the claimants have made a strong showing that Shane Company will cease to exist if all its assets remain in the possession of the United States Marshals Service. In the ordinary case, proof that a going concern will be forced out of business during the pendency of litigation raises a presumption of irreparable harm. *See Blackwelder Furn. Co., Inc. v. Seilig Mfg. Co., Inc., supra,* and *Federal Leasing, Inc. v. Underwriters at Lloyd's, supra.* However, this case is not ordinary because it arises in the context of a civil forfeiture action and because of the facts showing it to have little integrity as a proprietorship. A close look at Shane Company is necessary in order to determine what kind of harm the claimants will suffer if an injunction is not granted and the business remains closed.

Claimant Brian Keith Thomas is the record owner of Shane Company. Claimant Grady Jacob Mitchell claims that he is the real owner of Shane Company. This arrangement was the result of a series of questionable transactions to which Mitchell admitted during the hearing. The first transaction was made so that Grady Mitchell could avoid creditors and obligations to the Internal Revenue Service. The second transfer was admittedly made to avoid Mitchell's financial and marital problems.

Although Thomas and Mitchell are united in their efforts to obtain a release of the property of Shane Company, their testimony was in conflict as to who is the real owner. Brian Keith Thomas claims he is the owner of Shane Company. However, Grady Mitchell has never given up control of the company, and has continued, until the seizure, to use the company for his own personal benefit, using name changes and title transfers whenever it was convenient to avoid his legal obligations.

Because the interest of Brian Keith Thomas in Shane Company is merely that of a strawman and an employee, the Court finds that he will not be irreparably harmed by the continued seizure of the company's assets. He only suffers loss of employment as do the other employees. While this is a significant personal loss, it is not a cognizable one for purposes of a preliminary injunction. Also, to the extent Thomas claims an interest in helping his father-in-law avoid legal obligations, loss of that opportunity is not cognizable harm.

As for Grady Mitchell, the continued seizure of Shane Company means that he will lose the use of the company to avoid creditors, tax liabilities, and court orders based on his marital responsibilities. The government has also shown strong evidence that Shane Company and Mitchell and Thomas are involved in receiving stolen vehicle parts. The closing of Shane Company will cause him to lose the ability to use the company for that purpose as well. Furthermore, Mitchell will lose the opportunity to run Shane Company as a sham business for his own personal use with no regard to the legal obligations owed by the proprietorship to its employees or the state or federal government.

The Court is troubled by the possibility that a business will cease to exist if an injunction is not granted. The integrity of business should be protected *pendente lite.*

To do so, however, the business itself must have integrity. That is what is lacking in this case. The fact that Mitchell likely will not be returned to his original position, which at a bare minimum was using the company as a sham to skirt his legal and financial responsibilities, cannot be considered a great injury.

The government shows some likelihood of harm if Shane Company is allowed to continue operating. The Court finds that the company will lose money if it continues to operate, and the assets will be diminished. It also finds that there is a good likelihood Shane Company could not have generated the revenues needed to accumulate the company's sizeable assets in such a short period of time. There is evidence to believe that the company has been propped up with illegitimate resources.

It appears that claimant Mitchell seeks to have the best of both worlds. He does not report money on the Shane Company books when he needs to avoid his obligations. But, when he comes to court asking for an injunction, he claims the company is very profitable and he seeks to show the profitability by including "outside" funds as company assets.

The issue is not simply whether Shane Company is a profitable one. The Court would be chary to allow a business to die based on preliminary guesses by accountants. As claimants point out, many businesses go through a period where they sustain losses. Also, while it appears that Shane Company is not profitable, this is merely a preliminary prediction. However, Shane Company and its owners must accept responsibility for the difficulty in making the prediction because of their huge disregard for proper procedures, record keeping and legal obligations. Add to this lack of integrity and the sham purpose of the company, and the Court is presented an entirely different problem. The Court must ask itself whether granting the injunction will involve it in the ruse which is represented by Shane Company. Under these circumstances, the Court will pay even closer attention to the government's harm as well as whether the Court could even fashion a suitable plan to permit the business to operate.

When a company must resort to creative accounting and dodging its legal obligations in order to show a profit, the Court will find it difficult to facilitate such conduct with an injunction. The Court could not allow Mitchell and Thomas to run the company. Both are tainted with drug sales and money laundering. Moreover, both are tied to forfeitable stolen vehicles and parts (18 U.S.C. § 512) and clear disregard of tax and legal obligations in running Shane. A trustee, with undefined expenses, would be required. Moreover, in light of the apparent poor financial condition of the company and the sham nature of it, this case does not appear to present a suitable situation for the appointment of a trustee. Considering all these factors, the balance of hardship does not favor the claimants.

Looking at the merits of the case, claimants urge that they need only show that "grave and serious questions are raised" by the litigation because they have made such a strong showing of irreparable harm. *Blackwelder*, 550 F.2d at 196. The Court notes that the government's evidence of drug trafficking, and particularly money laundering, was not overwhelming and does leave serious questions open for litigation. The question of whether there were in fact large infusions of drug money into Shane Company is disputed and may have to be resolved by an audit. However, consideration of the moving party's likelihood of success on the merits requires the use of a sliding scale analysis. If a party makes a high showing of irreparable harm, then it is enough if "grave and serious questions" are raised, but if the showing is that irreparable harm is merely "possible," the moving party must show a high likelihood of success on the merits. *Federal Leasing*, 650 F.2d at 499 (quoting *Blackwelder*, 550 F.2d at 196). Because claimants' likelihood of irreparable harm is offset by their deceptive uses of the company, the "balance of harm" does not tip decisively in favor of the claimants. Thus, while the claimants are not required to fully prove their case at this point, some showing of ultimate success would have been appropriate.

The government has submitted affidavits which establish probable cause that Shane Company was used to transport marijuana

and cocaine, and that drug proceeds have been laundered through the company. The search of Shane Company property found trace amounts of drugs in Mitchell's office and residence. Over $60,000.00 in cash was found in Mitchell's office. The search also located packaging materials which are typically used in drug transportation. A drug dog alerted on the packaging material and the $60,000.00.[2] Part of the problem in proving money laundering arises from the abysmal state of Shane Company records and the cavalier manner in which the company was run. Yet, there is some corroboration of the money laundering allegations set out in the seizure affidavits. The government's evidence certainly meets the burden of showing probable cause that there was a substantial connection between Shane Company property and the laundering of drug proceeds for the purposes of this preliminary hearing. *See U.S. v. Thomas,* 913 F.2d 1111.

Claimants' showing of success on the merits consisted of Grady Mitchell's testimony that a girl, whose name he could not remember, left the small amount of marijuana which was found in his condominium. He testified that he never used or dealt drugs, and he had never known of anyone else selling or using drugs at Shane Company. Mitchell also testified that he had seen the stolen red tractor cab which was found in the Shane Company shop, but he did not know who purchased it or where it came from. Brian Keith Thomas took the fifth amendment when he was asked about the red tractor cab, and he did not testify at all regarding drugs. Other than Mitchell's general denial of drug activity, claimants have not offered any evidence which demonstrates that they will be able to prove by a preponderance of the evidence that the property was not obtained in violation of the law or otherwise linked to illegal drug transactions. *Id.* Because there is an issue of credibility, claimants have shown a question to be resolved by the litigation. But they demonstrate no more than a minimal showing of success on the merits-not enough for a preliminary injunction-particularly when the public interest is considered.

In this case, the "public interest and the potential harm to the government coincide." *James A. Merritt and Sons v. Marsh,* 791 F.2d 328, 331 (4th Cir.1986). The public interest is served when assets from drug and money-laundering enterprises are forfeited. Forfeiture offsets the costs of law enforcement as well as removing the incentive to commit crime. The government and the public are interested in maintaining the highest value possible for the seized assets while the litigation is pending. Even more importantly, the government and public also share a common interest that illegal activities are stopped *pendente lite.* "It is sometimes concluded that an individual must suffer the risk of possible harm rather than ... jeopardize the public welfare." *Wetzel v. Edwards,* 635 F.2d 283, 290 (4th Cir.1980) (citation omitted). Juxtaposing these factors against claimants' use of Shane Company for improper business and legal purposes, it is not unfair that they be required to bear the risk that their sham "business" will not survive this litigation.

## Conclusion

Claimants have failed to demonstrate that they will suffer legitimate irreparable harm by the continued seizure of Shane Company. The government has established that the company has been run as a sham, would not be profitable if it was required to meet all of its obligations, including tax liabilities, and continued operation of the company will diminish the value of the property which was seized. Claimants have not shown a likelihood of success on the merits. Finally, the public interest does not favor the continued operation of Shane Company and there is a need to protect the government's assets. After considering all four of the *Blackwelder* factors and weighing each factor according to the circumstances presented by this case, it is concluded that a preliminary injunction should not be issued. As an aside, it should be noted that even if the Court were to issue an injunction, a substantial bond would be required which claimants could not meet. In this case, the government should not be

---

2. In addition to the government's evidence of drug trafficking, many stolen truck parts were found on the premises of Shane Company during the search.

forced to rely on the less sure protection of liens on rolling stock, as opposed to a secured bond.

IT IS THEREFORE ORDERED that claimants' motion for a preliminary injunction is denied.