**UNITED STATES of America,
Plaintiff,**

**v.**

**$22,991.00, MORE OR LESS,
IN UNITED STATES
CURRENCY**

**and**

**One American Arms .22 Magnum
Revolver, Serial No. 214835,
and Ammunition.**

**No. CIV.A. 00–1097–L.**

United States District Court,
S.D. Alabama,
Southern Division.

July 17, 2002.

Ronald Wise, U.S. Attorney's Office, Mobile, AL, for plaintiff.

Bruce Maddox, Montgomery, AL, for claimant.

ArLease Prevo, Montgomery, AL, pro se.

Derrick Wise, Montgomery, AL, pro se.

## MEMORANDUM OPINION AND ORDER

LEE, United States Magistrate Judge.

This is a civil action *in rem* for the forfeiture of $22,991.00 in United States currency pursuant to 21 U.S.C. § 881(a)(6), and of a revolver (and ammunition) pursuant to 21 U.S.C. § 881(a)(11). On May 30, 2002, a bench trial was held before the undersigned Magistrate Judge for the purpose of eliciting evidence with respect to the plaintiff United States' allegations in this action. Prior to the commencement of trial, the parties executed their written consent to the exercise of jurisdiction in this action by a United States Magistrate Judge, in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, and the matter was referred to the undersigned. (*See* Court File). As set forth below, the undersigned has determined to enter judgment in favor of the United States, and, accordingly, the defendant currency, revolver and ammunition shall be forfeited to the permanent custody and control of the United States.[1]

## FINDINGS OF FACT[2]

I. *The Events of August 13, 2000*

1. The Claimant in this case is Ms. Arlease Prevo, who at all relevant times

---

1. On May 23, 2001, Chief District Judge Butler, to whom this action initially was assigned, entered a "Default Judgment on Forfeiture" as to the interest of Derrick Wise in the defendant currency, revolver and ammunition. (Doc. 28).

2. The facts found herein by the Court are derived from the undisputed facts set forth in the parties' pretrial order, filed on April 5, 2002 (Doc. 66), the credible testimony of witnesses presented at trial, and documents and pictures admitted into evidence during trial.

has resided at 2174 George Mull Street, Montgomery, Alabama.

2. On August 13, 2000, at approximately 8:45 a.m., Ms. Prevo drove her own vehicle from her home in Montgomery to the Loxley Work Release Center ("Center") in Loxley, Alabama. The Center is a correctional institution. Ms. Prevo arrived at the Center premises for the purpose of picking up inmate Derrick Wise on the basis of an "eight-hour pass" to leave the Center premises granted to Mr. Wise.

3. At that time, Mr. Wise was incarcerated at the Center in connection with a ten-year sentence he was serving on drug-related charges. In particular, Mr. Wise had pled guilty to, and had been convicted of, dealing crack cocaine on four separate occasions out of Ms. Prevo's residence. Mr. Wise, referred to by Ms. Prevo as her "common law husband," had lived with Ms. Prevo at her residence from an unspecified date in 1995 until April 1999, when he was incarcerated for the above-referenced drug-related offenses. The testimony at trial also established that Mr. Wise has an extensive criminal history, other than with respect to these particular drug offenses, and in prior years had been incarcerated on other unspecified charges.

4. Captain Gary Hetzel of the Alabama Department of Corrections ("ADOC"), an Assistant Warden at the Center, testified that Mr. Wise began his incarceration in the custody of the ADOC on or about April 23, 1999, and was transferred to the Center on or about April 28, 2000.

5. At all relevant times, at the entrance to the Center, a sign was posted clearly notifying all visitors that vehicles entering the premises were subject to search; that firearms, alcoholic beverages and illegal or narcotic substances were strictly prohibited; and that anyone transporting or possessing such items was subject to criminal prosecution. (Gov.Exh. 3A).

6. Around the time of Ms. Prevo's arrival at the Center on August 13, 2000, routine searches of visiting automobiles for contraband and other items were being conducted under the supervision of Captain Hetzel. Such searches included the use of certified drug detection dogs under the supervision of qualified staff at the Center.

7. Upon having entered the Center's visitor parking area, Ms. Prevo was approached in her automobile by Sergeant Kerry Mitchum of the Loxley, Alabama, Police Department. Ms. Prevo was asked whether she had any weapons or drugs in

---

Documents and pictures admitted into evidence during trial are referred to specifically as either "Govt. Exh." when tendered by the United States, or "Def. Exh." when tendered by the claimant Ms. Prevo.

In addition, at the outset of Ms. Prevo's testimony during the presentation of the government's case-in-chief, as well as during the testimony Ms. Prevo gave on her own behalf during the presentation of her case, the Court fully explained to her the nature and availability of the privilege against self-incrimination afforded by the Fifth Amendment to the United States Constitution. At trial, Ms. Prevo stated that there were criminal charges pending against her. Nevertheless, with the exception of one line of questioning posed to

Ms. Prevo by the government concerning certain aspects of her history of drug use, Ms. Prevo otherwise knowingly and voluntarily waived her privilege against self-incrimination during trial, and gave testimony during the government's case-in-chief and during the presentation of her case. "The very fact of a parallel criminal proceeding, however, d[oes] not alone undercut [a claimant's] privilege against self-incrimination, even though the pendency of the criminal action forced [her] to choose between preserving [her] privilege against self-incrimination and losing the civil suit." *United States v. Lot 5, Fox Grove, Alachua County, Florida,* 23 F.3d 359, 364 (11th Cir.1994)(quoting *United States v. Little Al,* 712 F.2d 133, 136 (5th Cir.1983)).

her vehicle. Ms. Prevo responded by stating that said she wanted to leave, but was not allowed to do so by Sergeant Mitchum. Ms. Prevo complied with Sergeant Mitchum's directive to turn off the ignition and to exit the vehicle. Ms. Prevo then told Sergeant Mitchum that she had a gun in her purse.

8. At this point, Officer James Turberville of the Chickasaw, Alabama Police Department, who was assisting at the Center that day, had arrived at the area where Ms. Prevo's automobile was parked. Ms. Prevo handed to Officer Turberville a loaded .22 "American Arms" magnum revolver that had been in her purse on the front seat of her automobile. Ms. Prevo did not have a permit to carry a gun, and denies ownership of the defendant revolver and ammunition. Ms. Prevo testified that the revolver belonged to a "friend" of another friend of hers named Wardell Washington, whom, as discussed *infra*, the evidence at trial shows was engaged in at least one drug transaction at Ms. Prevo's residence in October 2000.

9. At this time, a more extensive search of Ms. Prevo's automobile was conducted, which included Officer Turberville's certified drug detection dog being walked around the automobile. Officer Turberville is a certified handler of drug detection dogs. Officer Turberville's dog "alerted on" the trunk area of Ms. Prevo's automobile. The key to the trunk was retrieved from the automobile's ignition.

10. Officer Turberville then placed his dog in the trunk of Ms. Prevo's automobile. The dog immediately alerted on a brown wooden box with a padlock on it. The key to the box was retrieved from Ms. Prevo. The box was opened, and was found to contain two bundles of United States currency, namely one-hundred dollar bills, banded with paper wrappers.

11. Having discovered the bundled cash in the wooden box, other areas of the trunk were searched, yielding two additional items of note—a blue "beach" bag which already was open, and a leather purse. The bag contained: (a) two additional bundles of one-hundred dollar bills, similarly banded with paper wrappers; (b) a home-made crack cocaine pipe, made from a liquor bottle, which had been used and had lipstick on or about the mouth of the bottle; and (c) two small film canisters, one of which contained several off-white colored rocks which were later shown by an analysis performed by the Alabama Department of Forensic Sciences to contain 0.68 grams (or 0.02 ounces) of crack cocaine. (Govt.Ex. 7). The canisters were packed individually in coffee grounds and were covered with aluminum foil. Officer Turberville testified that, in the drug trade, it is common for coffee grounds to be used to mask the smell of crack cocaine. Furthermore, the leather purse was found to contain within it a small green pouch holding a stack of one-hundred dollar bills, which, unlike the other cash discovered at that time, was not bundled with paper wrappers.

12. In total, the aggregate amount of $22,991.00 in cash in United States currency was found in the trunk of Ms. Prevo's automobile in the wooden box, beach bag and leather purse. (Govt. Exhs. 1–A through 1–J, and 25–A through 25–F).

13. The law enforcement officers on the scene gathered all of the cash together and placed it on the ground of the parking lot next to Ms. Prevo's automobile. At that time, Officer Turberville's dog demonstrated a positive alert for the presence of drugs on the cash. Immediately thereafter, Officer James Ferguson and Officer Mitchum escorted their own drug dogs to the area, who also demonstrated, respectively, positive alerts for the presence of

drugs on the cash. Ms. Prevo did not dispute the testimony of the government's witnesses at trial that these three dogs were certified to engage in drug detection and that these three law enforcement officers were certified drug dog handlers.

14. The cash was not counted by law enforcement officials on the scene. After all three of the dogs positively alerted on the cash, the cash was taken inside the Center facility and was counted. A separate laboratory analysis of the presence of drugs on the cash was never conducted. The only analysis that was conducted was, as referred to *supra*, with regard to the crack cocaine itself.

15. Officer Mitchum testified that Ms. Prevo's purse found on the front seat of her automobile also contained cash, but that cash was not seized. Only the cash found in trunk of Ms. Prevo's automobile, totaling $22,991.00, was seized.

16. Agent David Fagan, of the federal Drug Enforcement Agency ("DEA") task force, interviewed Ms. Prevo on August 13, 2000. Agent Fagan testified that Ms. Prevo told him that she had planned, after returning Mr. Wise to the Center at the end of that day, to travel to Tallahassee, Florida, for the purpose of moving there. When Agent Fagan questioned her about the lack of luggage in the automobile, or other indicia of moving, Ms. Prevo responded that she was just going to stay with a male friend in Tallahassee and that she might be returning to Montgomery.

17. With respect to the defendant loaded revolver in her purse, Ms. Prevo admitted to Agent Fagan that she had possessed the revolver for her own "protection." Ms. Prevo also admitted to Agent Fagan that the crack cocaine found in her automobile was hers, that she was a user of crack cocaine, and that she had purchased the crack cocaine from a woman in Montgomery.

18. With respect to the amount and ownership of the cash found in the trunk of her automobile, Ms. Prevo gave inconsistent accounts to Agent Fagan as to the exact amount of cash she possessed, guessing several times. Ms. Prevo also stated inconsistently to Agent Fagan that, on the one hand, the money belonged to her and that she had been saving it for some time. On the other hand, she stated on at least two occasions that approximately $8,000.00 to $14,000.00 of the money belonged to Mr. Wise, and that the cash constituted proceeds from drug sales.

19. Agent Fagan testified that the $22,991.00 found in the trunk of Ms. Prevo's automobile was, at the time, within the approximate range of $22,000.00 to $25,000.00, the price of one kilo of cocaine in the Mobile, Alabama, area.

20. The defendant currency, revolver, and ammunition were confiscated and subsequently delivered to the United States Marshal's Service pursuant to a seizure warrant issued by this Court. In connection with these events, Ms. Prevo was charged in state court with unlawful possession of a controlled substance, possession of drug paraphernalia, and carrying a pistol without a permit. (Def.Exh. 6–B).

21. On November 16, 2000, Ms. Prevo submitted to the DEA her "Statement of Claimant/Property Seized." (Govt.Exh. 6). This lengthy and detailed statement was signed and dated by Ms. Prevo on that date, and was signed under penalty of perjury before a notary public. The Court notes that the date of this statement is only approximately three months after August 13, 2000. In pertinent part, Ms. Prevo stated as follows:

> Upon my arrival at the Loxley Work Release Center, unfortunately, the law officers was [sic] having a prejudice routine search. I was only going to be

there for a matter of minutes; just to pick up my common-law husband, who was going on his [third] 8 hours pass. After being given a choice, I chose not to have my car search[ed]. I quoted to him, "that I would rather leave, than to have my car search[ed]." Then the officer asked me if I had any weapons in the car, slowly, I gracefully handed him the pistol from my purse. They rudely demanded me out of my car, putting hand-cuffs on me. Then they forcefully search[ed] my car inside, finding nothing, then outside. This is when they found the money, ($20,000.00) in the trunk of my car. Having to come back to get ($2,991.00) from my purse, leaving approximately ($129.00) scattered in my purse. I wondered why did they get some money then leave some there? While I was being search[ed] in the facility restroom, I returned outside to my car to find that a small portion of an unlawful controll[ed] substance (.06) grams was found in the front seat of my car. I assumed that I had accidently put it there, being that I was rushing to make that long drive. Nevertheless, I do have a drug addiction problem that I'm seeking help for.

(*Id.*, at 4). Thus, Ms. Prevo admitted that she placed crack cocaine in her automobile, and that at the time she was suffering from a drug addiction. The Court notes that the evidence presented at trial does not reflect any drugs actually being found in the "front seat" of Ms. Prevo's automobile, as she states above, as the drugs and drug paraphernalia were found in the trunk. The Court finds this discrepancy to be immaterial, as it is highly significant that Ms. Prevo incriminated herself by admitting, in a sworn statement to a law enforcement agency, to having placed drugs in her car on August 13, 2000.

II. *Additional Evidence of Ms. Prevo's Involvement with Drugs and Drug Transactions, Both Prior to and After August 13, 2000*

22. Ms. Prevo testified that she has smoked crack cocaine. While she denied during her trial testimony to having ever had an addiction to drugs, in contrast, her November 16, 2000 sworn statement to the DEA, referred to *supra*, indicates to the contrary that she has had a drug addiction problem. (Govt.Exh. 6).

23. At trial, the government presented credible and probative testimony of four witnesses that controlled drug transactions were conducted at Ms. Prevo's residence both before and after August 13, 2000. This testimony was provided by Officers Williams Simmons and William Hamil, both narcotics detectives with the Montgomery, Alabama Police Department, as well as by two undercover informants paid by that department, Carl Stovall and Tim Tucker. The detectives testified that Ms. Prevo's residence is known to law enforcement as an address at which drug transactions routinely have been conducted, during the time Ms. Prevo resided there.

24. First, the government's evidence at trial demonstrated that, between February 11, 1998 and May 7, 1998, four separate controlled crack cocaine purchases, overseen by Officer Hamil, occurred at Ms. Prevo's residence. The amount of crack cocaine involved in each purchase varied between $60.00 worth to $100.00 worth. On each occasion, Ms. Prevo's alleged "common law husband," Mr. Wise, sold the crack cocaine to the informant Mr. Stovall, and on the first and last occasion, Ms. Prevo was involved to some degree. With respect to the first occasion, Ms. Prevo greeted Mr. Stovall at the back door of her residence when he arrived in his vehicle, prior to the drug transaction occurring. With respect to the fourth and final occa-

sion, Ms. Prevo handed the crack cocaine to Mr. Stovall. At trial, Mr. Stovall identified Ms. Prevo in open court as being this person, on both occasions. Mr. Wise was indicted for his participation in these four controlled drug buys. Mr. Wise pled guilty and was incarcerated, as referred to, *supra*. Ms. Prevo's and Mr. Wise's participation together in the drug trade is further supported by language contained in a letter she wrote to him approximately one month after he was incarcerated, on May 3, 1999: "It's 7:30 a.m. the morning of your Birthday. I'm getting ready to handle your business now. I did just that." (Govt.Exh. 19).

25. Second, on October 28, 2000, approximately one month after the defendant items were seized from Ms. Prevo's automobile on August 13, 2000, Officer Simmons oversaw another controlled crack cocaine purchase at Ms. Prevo's residence, conducted by the informant Mr. Tucker. On this occasion, when Mr. Tucker arrived at Ms. Prevo's residence in his vehicle, Ms. Prevo came to the back door of the residence and stated to him, "What you want, forty?" Mr. Tucker did not exit his vehicle, and nodded his head in the affirmative. A few moments later, Ms. Prevo's friend, Wardell Washington, emerged from the residence and approached Mr. Tucker in his vehicle. Mr. Tucker gave the man $40.00 in cash, that had been given to him by the detectives, and Mr. Washington handed Mr. Tucker $40.00 worth of crack cocaine. (Govt.Exh. 23). At trial, Mr. Tucker identified Ms. Prevo in open court as being the person who first greeted him in regard to this transaction.

26. The Court finds the above to constitute credible and probative evidence that Ms. Prevo was a participant in the transacting of crack cocaine for money, on the premises of her own residence, both before and after the events at issue on August 13, 2000.

### III. *Absence of Legitimate Origin of Currency*

27. The $22,991.00 in cash found in Ms. Prevo's automobile on August 13, 2000, is an unusually large sum of cash, and an amount. not commonly kept in one's own vehicle. At trial, the government tendered evidence to demonstrate the absence of a legitimate origin of the currency confiscated from her automobile and to refute Ms. Prevo's claim that she had accumulated this sum of money over a period of years.

28. At trial, the government introduced records generated by the Social Security Administration ("SSA") (Govt.Exh. 20), which reflect the following earnings for Ms. Prevo reported to the SSA, broken down by calendar year: 1980: $2323.00; 1981: $1252.00; 1982: $497.00; 1987: $1962.00; 1990: $3334.00; 1991: $5586.00; 1992: $3987.00; 1993: $8538.00. As is reflected, there is no income accounted for during several years between 1980 and 1993.

29. Moreover, at trial, Mary Ann Osborne of the Internal Revenue Service ("IRS") testified for the government that, from tax years 1990 through 2000, Ms. Prevo self-reported income only for the years 1993 and 1994, reflecting $8,790.00 and $3,571.00, respectively, in adjusted gross income. Ms. Osborne also testified that the IRS audited Ms. Prevo's tax returns for these years and made additional tax assessments totaling $4,157.82, due to the fact Ms. Prevo had claimed a dependant whom she was not legally entitled to claim. Ms. Osborne further testified that, while the IRS has asked for these assessments to be paid, Ms. Prevo still failed to pay them.

30. At trial, Ms. Prevo testified during the government's case-in-chief that her av-

erage monthly expenses have been comprised of an electric bill of $120.00; a water and garbage bill of $28.00; a gas bill of $116.00; a telephone bill of $400.00; and a food bill of $300.00. The Court totals these amounts to comprise approximately $11,500.00 per year, which would appear to far exceed Ms. Prevo's approximate annual income. Ms. Prevo also testified that, between 1995 through 2000, she put a new roof on her house at the cost of $600.00; incurred automobile repairs totaling $600.00; and purchased at least one automobile for the sum of $1900.00. She also testified that, because she had no medical insurance, she paid $2,500.00 toward a $8,714 medical expense she incurred for surgery performed in June 2000.

31. Testimony also was elicited by the government from Ms. Prevo about her numerous outstanding debts, which further undermines Ms. Prevo's claim that the defendant currency was accumulated over a period of years. (Govt. Exhs. 10 through 14, 16, 17). For example, the government's evidence showed that, prior to the seizure of the currency, Ms. Prevo had a difficult time paying her bills and incurred several collection notices. (Govt.Exh.13). Again, Ms. Prevo failed to pay a debt to the IRS that has been due since 1994. Ms. Prevo testified that she did "the best I can to pay my bills," but that she also testified that she "wasn't too anxious on paying a bill right then" and that she "always let them get behind or sometimes cut off before [she] would pay them." It is not credible that Ms. Prevo would possess such a large amount of money ($22,991.00) during this time period, yet not use it to pay any of these comparatively small debts.

32. Ms. Prevo asserted at trial that the defendant currency was the result of savings from her free-lance seamstress business, operated out of her home. In support of this contention, she entered into evidence drawings of flyers promoting her fashion business and other similar items, and documents reflective of income derived from her business in the form of receipts given to customers. (Def.Exh. 3–D).

33. With respect to the flyers promoting her fashion business, such were made in the early to mid 1980s, and are too far removed in time from the events of August 2000 to be considered credible evidence to show a connection between the fruits of her business and cash she possessed approximately fifteen to twenty years later.

34. In any event, assuming Ms. Prevo maintained an ongoing seamstress business from the early 1980s through the period of time leading up to August 2000, the credible evidence of record reflects that she did not generate enough legitimate income during this time to amount to the $22,991.00 at issue. At trial, Ms. Prevo introduced copies of "receipts" of work she performed for customers during the years 1998, 1999 and 2000. (*Id.*). Ms. Prevo testified that her records of receipts for other years burned in a fire in a storage area adjacent to her residence, but did not offer evidence through other means to reflect income in prior years. The Court has totaled the sums of the receipts for these three years, which appear to amount to only approximately $5843.00, or approximately $1500.00 per year.

35. In an attempt to link the defendant currency specifically to a legitimate source, Ms. Prevo alleged at trial that, in 1996, she withdrew funds from her bank accounts, then kept that sum at her house before placing it in the trunk of her car for "safekeeping" on an unspecified date prior to August 13, 2000. (Trial Trans., at 66). Ms. Prevo maintained during her testimony that this cash directly represents the proceeds legitimately derived from her

seamstress business, and actually constituted more than the $22,991.00 at issue. In this regard, Ms. Prevo entered into evidence bank statements and related documents regarding one trust account and one savings account, representing to the Court that these documents would prove that she withdrew more than $22,991.00 in 1996. (Def.Exh. 4–B).

36. With respect to the trust account, Ms. Prevo introduced a bank statement reflecting a balance on June 30, 1996 of $9,067.63, and numerous withdrawal slips reflecting funds subsequently withdrawn from that account from that date through the end of 1996 totaling $6,020.00. This account was a savings account held in trust, in the name of, Leticia Nicole Hill, of which Ms. Prevo was listed as trustee. Ms. Prevo testified rather nonchalantly that these were really her monies which she placed into a trust in the name of her ten-year old niece for the purpose of avoiding the repayment of federal education loans. With respect to the savings account, Ms. Prevo introduced a bank statement reflecting a balance on December 31, 1995 of $2,021.21. (*Id.*). There is no indication that this particular amount was ever withdrawn from the bank. Such evidence, relating at most to the withdrawal of some funds during 1996, hardly provides credible evidence of a legitimate source for the defendant currency found approximately four years later. Contrary to her testimony, the documentary evidence tendered by Ms. Prevo herself reflects that the amount she actually withdrew from the bank in 1996 was well short of the $22,991.00 at issue.

37. In sum, Ms. Prevo's average monthly expenses and other expenditures referred to, *supra*, easily would have exhausted the money she asserts she withdrew from the bank, referred to *supra*, or otherwise generated in income.

38. The Court finds the above to constitute credible and probative evidence that there is not a legitimate or innocent source of the currency at issue, prior to its seizure on August 13, 2000.

## IV. *Ms. Prevo's Testimony Was Without Credibility*

39. Throughout trial, Ms. Prevo's testimony was inconsistent, evasive and without credibility. Some examples, other than what is referred to elsewhere in this Memorandum Opinion and Order, are as follows.

40. First, based upon all the prior pleadings, the exhibits and the prior representations to the Court, the amount of money seized and at issue in this case has always been alleged by Ms. Prevo to be $22,991.00, which is consistent with the amount the government's witnesses allege was seized from Ms. Prevo's automobile trunk on August 13, 2000. For example, in Ms. Prevo's "Statement of Claimant Property Seized" (Govt.Exh. 6), submitted by her to the DEA in November 2000, only approximately three months after the seizure, Ms. Prevo repeatedly refers to the amount of money that was in her vehicle as $22,991.00. In fact, Ms. Prevo begins her statement with the words, "I, Arlease Prevo declare that the $22,991.00 that was seized from my vehicle on August 13, 2000; was earned legally and accumulated over a number of years, from hard honest work. I will provide you with the time and labor that I devoted for most of my life to accumulate this saving of $22,991.00." (*Id.*, at 1).

41. However, at trial, Ms. Prevo testified, and alleged for the first time, that she actually had $35,000.00 in currency in her vehicle when the officers seized the money—apparently implying that the officers stole or lost approximately $12,000. The Court finds that Ms. Prevo's testimony at

trial that there actually was $35,000.00 in her automobile to be an outright fabrication, in light of her numerous prior representations.

42. Second, Ms. Prevo testified several times at trial that she had no idea how the crack cocaine that was found in her vehicle got there. However, again, Ms. Prevo's own pre-trial statements severely contradict her trial testimony. As referred to *supra*, Ms. Prevo admitted in her November 16, 2000 sworn statement to the DEA that she "assumed" that she "accidently put it there, being that I was rushing to make that long drive." (Govt. Exh. 6, at 4). When confronted with this inconsistency on cross-examination during trial, the Court observed Ms. Prevo's attempt to reconcile the contradictory statements wholly incredible. In this regard, Ms. Prevo testified: "This says: 'Accidently put it there.' But back then I was—I—wasn't sure of what was going on. I wasn't sure. I don't know. I don't think I put it there. I know I didn't put it there now. But back then I wasn't sure." (Trial Trans., at 84). Agent Fagan testified that on the day of the seizure, Ms. Prevo admitted to him that the crack cocaine found in the automobile was hers.

43. Third, Ms. Prevo testified at trial that she had never been addicted to any kind of drug, in direct contradiction to a statement she made to the DEA in her "Statement of Claimant Property Seized," referred to, *supra*, that, "I do have a drug addiction problem that I'm seeking help for." (Govt.Exh. 6).

44. Fourth, during her testimony at trial, Ms. Prevo denied she was at her residence when any drug sales were made, and denied knowledge of any drug-related arrests on or about the premises of her residence. For example, Ms. Prevo was asked: "And during the last five years have there been at least three drug ar-

rests" at her address "that you know about?" Ms. Prevo responded, "I'm not sure." (Trial Trans., at 8). However, Ms. Prevo later admitted she was at her residence on one occasion when Mr. Wise sold crack cocaine to an informant for the Montgomery Police Department. Ms. Prevo also testified that, "[e]ven though these things happened at my house, most of the times I am not there." (Trial Trans., at 63).

45. The Court finds Ms. Prevo's inability or unwillingness to testify consistently and truthfully throughout the trial in this action further belies her assertion that the defendant currency was derived from a legitimate source. Moreover, the fact of Ms. Prevo's untruthfulness about the source of the cash provides additional evidentiary support for the government's assertion that the defendant currency is in fact drug proceeds.

## CONCLUSIONS OF LAW

The instant complaint was filed on December 19, 2000. (Doc. 1). Thus, the standards set forth in Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") (Pub. L.106–185; 18 U.S.C. § 981, *et seq.*) apply to this action, as section 21 of CAFRA provides that it is intended to govern civil forfeiture proceedings commenced on or after August 23, 2000. *See, e.g., U.S. v. Real Property in Section 9, Town 29 North, Range 1 West Township of Charlton, Otsego County, Michigan,* 241 F.3d 796, 798 (6th Cir.2001). The provisions of CAFRA "materially altered the various burdens of proof in civil forfeiture actions filed in federal courts." *U.S. v. One Parcel of Property Located at 2526 Faxon Avenue, Memphis, Tennessee,* 145 F.Supp.2d 942, 949 (W.D.Tenn.2001). Now, under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the

property is subject to forfeiture...." 18 U.S.C. § 983(c)(1).

Because the government's theory of forfeiture in this action "is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense...," under CAFRA, the government now is required to establish by a preponderance of the evidence "that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). In attempting to meet its burden in this regard, the government is entitled to use evidence "gathered after the filing of a complaint for forfeiture." 18 U.S.C. § 983(c)(2).[3]

With regard to the element of "substantial connection" which must be proved by the government, although a showing of mere "probable cause" no longer is sufficient, there continues to be no requirement that the government tender direct evidence of a connection between the subject property and a specific drug transaction. 18 U.S.C. § 983. *See, e.g., U.S. v. $4,255,000.00,* 762 F.2d 895, 904 (11th Cir. 1985), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986)(prior to enactment of CAFRA; declining to impose a requirement that evidence be presented of a "particular narcotics transaction").

Thus, the presentation of circumstantial evidence by the government continues to be a permissible form of proof in a civil forfeiture action. *See, e.g., U.S. v. $345,510.00 in U.S. Currency,* 2002 WL 22040, *3 (D.Minn. Jan.2, 2002)(post-CAFRA case: "the Government has produced an aggregate of circumstantial evidence sufficient to establish by a preponderance of the evidence that the Defendant currency was connected with narcotics activity.").

## I. *The Defendant Currency*

 As an initial matter, the Court concludes that Ms. Prevo has standing to contest the forfeiture of the defendant currency, because she asserts that she legally owns and possesses the currency. *See, e.g., U.S. v. Carrell,* 252 F.3d 1193, 1201 (11th Cir.2001)("[t]o have standing to contest a § 881(a)(6) forfeiture, a claimant must have an ownership or possessory interest in the property seized.")(internal quotation marks and citation omitted).

21 U.S.C. § 881(a)(6) provides in pertinent part that the defendant currency is subject to forfeiture if it constitutes "...moneys...furnished or intended to be furnished by any person in exchange for a controlled substance...all proceeds traceable to such an exchange, and all

---

3. Among other things, CAFRA has enhanced the government's initial burden of proof from a mere showing of "probable cause" to believe that the subject property was involved in unlawful activity, to proof by a preponderance of the evidence of "a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(1) and (3). However, in essence, the government is obligated to prove the same connection between the subject property and the offense that it was required to prove under the pre-CAFRA law, but it now must do so by a preponderance of admissible, non-hearsay, evidence. *See The Civil Forfeiture Reform Act of 2000: Expanded Government Forfeiture Authority and Strict Deadlines Imposed on All Parties,* 27 J.Legis. 97, 110

(2001). As stated by one sister court has observed, as a consequence of CAFRA:

> [T]he government is not entitled to proceed by civil complaint for forfeiture solely on probable cause, but must establish, by a preponderance of the evidence, that the property is subject to forfeiture. This being true, it cannot proceed on mere hearsay. And a claimant (who has appropriate standing) can now 'put the government to its proof', without doing more than denying the government's right to forfeit the property.

*One Parcel of Property Located at 2526 Faxon Avenue, Memphis, Tennessee,* 145 F.Supp.2d at 950 (footnote omitted).

moneys...used or intended to be used to facilitate [such an exchange]...." The "violation of this subchapter" alleged by the government is the "Controlled Substances Act, as amended." (Doc. 1, at 5). Cocaine, the drug at issue in this regard, is a controlled substance for these purposes. *See, e.g., U.S. v. One 1976 Lincoln Continental Mark IV, VIN 6Y89A852019,* 584 F.2d 266, 268 (8th Cir.1978). The term "facilitate" means making the illegal activity "easy or less difficult." *U.S. v. Approximately 50 Acres of Real Property Located at 42450 Highway 441, North Fort Drum, Okeechobee County, Florida,* 920 F.2d 900, 902 (11th Cir.1991) (citation omitted).

Thus, in sum, it is the government's burden with respect to the defendant currency to prove by a preponderance of the evidence that there is a "substantial connection" between the currency and the purchase or sale of cocaine. *See, e.g., $345,510.00 in U.S. Currency,* 2002 WL 22040, at *2 (interpreting CAFRA: "[t]he Court must...determine whether these facts are sufficient to establish by a preponderance of the evidence that the Defendant currency is connected with illegal narcotics activity.")(citing 18 U.S.C. § 983(c)(1)).[4]

■ In the present action, the Court concludes that the government has sustained its burden of proof to warrant the forfeiture of the defendant currency. Seven factors, considered in their aggregate, persuade the Court that a preponderance of the evidence exists to show a "substantial connection" between the defendant currency and the purchase or sale of crack cocaine. As derived from the Court's findings of fact, *supra,* the Court addresses and weighs the legal significance of each of the pertinent factors, below.

First, the defendant currency, $22,991.00, is an unusually large amount of cash to be transported in the trunk of an automobile. (*See* Finding of Fact 12, *supra*). The Court deems this to be highly probative, although not dispositive, circumstantial evidence of a link between this exorbitant amount of cash and illegal drug activity. Courts have recognized that, for purposes of a civil forfeiture action, the possession of a large sum of currency is strong evidence of narcotics trafficking. *See, e.g., U.S. v. $121,100.00 in U.S. Currency,* 999 F.2d 1503, 1507 (11th Cir.1993)("[a]lthough insufficient by itself to demonstrate a connection to illegal drugs, the quantity of cash seized [may be] highly probative of a connection to some illegal activity."). *See also U.S. v. Puche–Garcia,* 2000 WL 1288181, *4 (4th Cir.2000)(unpublished opinion)("[t]he carrying of 'unusually large amounts of cash' can help to establish the link to drug activity....")(quoting *U.S. v. Thomas,* 913 F.2d 1111, 1115 (4th Cir.1990)); *U.S. v. One Lot of U.S. Currency ($36,634.00),* 103 F.3d 1048, 1055 (1st Cir.1997)("[c]arrying a large sum of cash is 'strong evidence' of [a connection to illegal drug activity] even without the presence of drugs or drug paraphernalia.")(quoting *U.S. v. U.S. Currency, $83,310.78,* 851 F.2d 1231, 1236 (9th

---

4. The Court observes that Ms. Prevo has not alleged the affirmative defense of "innocent owner" pursuant to 18 U.S.C. § 983(d). The defense applies to situations in which, generally speaking, the claimant either did not know of the illegal conduct or knew of the conduct but took steps to prevent the subject property from being used to further the conduct. *Id.* Indeed, the underlying purpose of the defense would be incompatible with Ms. Prevo's claim to the subject property in this action—that the currency at issue constituted proceeds legitimately derived from her seamstress business, and not derivative of any drug-related transactions. Thus, in this Memorandum Opinion and Order, the Court does not address the elements of the innocent owner defense.

Cir.1988), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 752 (1990)); *U.S. v. Blackman,* 904 F.2d 1250, 1257 (8th Cir.1990)("large sums of unexplained currency," in connection with other evidence of drug trading, is "circumstantial evidence" of the intent to distribute cocaine); *U.S. v. $2,361.00 U.S. Currency, More or Less,* 1989 WL 135257, *2 (S.D.N.Y.1989)(a substantial amount of cash present is probative of illegal drug activity, because it is "well-known that drug-traffickers usually deal in cash."); *U.S. v. $32,310.00 in U.S. Currency,* 1988 WL 169271, *6 (D.N.J. 1988)("[a] large amount of cash unsatisfactorily explained constitutes strong evidence, standing alone, from which we may permissibly infer that the money was furnished in exchange for illegal drugs."); *U.S. v. $2,500.00 in U.S. Currency,* 689 F.2d 10, 16 (2nd Cir.), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984)(characterizing an amount of cash as low as $2,500.00 as being "substantially greater than is commonly kept...by law-abiding wage earners.").

Second, the defendant currency was located in close proximity to crack cocaine and cocaine paraphernalia. In fact, some of the cash was found in the same blue beach bag that contained the cocaine and paraphernalia. (*See* Findings of Fact 10, 11 and 12, *supra*). Ms. Prevo conceded to Agent Fagan that she had purchased the cocaine, and she represented in her sworn statement to the DEA that she "assumed" she placed the cocaine in her automobile. (*See* Findings of Fact 17 and 21, *supra*). The Court deems the proximity of the currency to drugs itself to be highly probative circumstantial evidence of a link between the cash and illegal drug activity.

Indeed, courts have recognized that, for purposes of a civil forfeiture action, the physical location of the subject property to the drugs, at the time those items are detected by law enforcement, is strong circumstantial evidence of narcotics trafficking. *See, e.g., U.S. v. $10,700.00 in U.S. Currency,* 258 F.3d 215, 224 (3rd Cir.2001)("claimants' possession of drugs or drug paraphernalia at the time of the seizure...would support the government's theory that the money in claimants' possession is connected to illegal drug trafficking."); *U.S. v. Currency: $4,424.00 (U.S.),* 1994 WL 568594, *4 (N.D.N.Y.1994)(probative that claimant possessed subject cash "in close proximity to distribution quantities of narcotics."); *U.S. v. $149,442.43 in U.S. Currency,* 965 F.2d 868, 877 (10th Cir.1992)("[t]he unusually large amount of hidden currency, the presence of drug paraphernalia, including packaging supplies and drug notations reflecting large drug transactions, establishes a sufficient nexus between the defendant property and claimant['s] involvement in drug trafficking."); *U.S. v. $80,760.00 in U.S. Currency,* 781 F.Supp. 462, 473 (N.D.Tex.), *aff'd,* 978 F.2d 709 (5th Cir.1992)("a large amount of money, found in combination with other persuasive circumstantial evidence, particularly the presence of drug paraphernalia..." is probative in a civil forfeiture proceeding); *U.S. v. $24,000.00 in U.S. Currency,* 722 F.Supp. 1386, 1390 (N.D.Miss.), *aff'd,* 902 F.2d 956 (5th Cir.), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991)("[t]he storage of the unexplained $24,000.00 in close proximity to a suitcase of eighteen pounds of marijuana in the cinder block foundation of the claimant's house indicates that the money seized is drug-related.").

Third, each of three certified drug detection dogs demonstrated a positive alert for the presence of drugs on the defendant currency. (*See* Findings of Fact 9, 13 and 14, *supra*). Although courts are divided as to the weight to be accorded evidence of this nature, it is commonly recognized that

such evidence is of at least minimal probative value, and should be considered in the totality of the evidence presented in a civil forfeiture action. "[A] positive alert by a police dog on a cache of money can have *some* probative value...particularly when it is considered along with other telling circumstances...[o]rdinary experience suggests that currency used to purchase narcotics is more likely than other currency to have come into contact with drugs." *Puche–Garcia,* 2000 WL 1288181, at *4. *See also U.S. v. $67,220.00 in U.S. Currency,* 957 F.2d 280, 285 (6th Cir.1992)("a positive dog reaction is at least strong evidence of a connection to drugs.").

Fourth, the amount of the defendant currency was established to be at or near the approximate street value of one kilo of cocaine in the Montgomery, Alabama. (*See* Finding of Fact 19, *supra*). Such is probative evidence that the $22,991.00 in question either was intended to be used to purchase a kilo of cocaine, or already had been received in exchange for a kilo of cocaine. *See, e.g., U.S. v. $33,500.00 in U.S. Currency,* 1988 WL 169272, *4 (D.N.J.1988)(inference that the currency is drug-related becomes "even stronger" where the amount seized is "approximately equivalent to the street value of one kilogram of cocaine.").

Fifth, several controlled crack cocaine transactions were conducted by law enforcement at Ms. Prevo's residence, both before and after August 13, 2000. Such transactions included the personal participation of Ms. Prevo, as recently as approximately one month after the events of August 13, 2000. (*See* Findings of Fact 23 through 26, *supra*). Ms. Prevo conceded to Agent Fagan that a significant portion of the defendant currency represented proceeds from one or more drug transactions conducted by her alleged "common

law husband," Mr. Wise. (*See* Finding of Fact 18, *supra*).

Ms. Prevo's personal involvement in the drug trade both before and almost immediately after the events of August 13, 2000, and her concession to a law enforcement official at least a large percentage of that the cash actually was derived from the drug trade, obviously is very strong evidence of a "substantial connection" between the currency and drug trafficking. *See, e.g., Carrell,* 252 F.3d at 1201 ("[e]vidence that claimants are generally engaged in the drug business over a period of time" is probative evidence in civil forfeiture proceeding) (citation omitted). *See also $10,700.00 in U.S. Currency,* 258 F.3d at 224 ("[a]s a matter of logic, circumstantial evidence implicating claimants in recent drug activities, such as, for example, evidence of claimants' contemporaneous affiliation with known drug traffickers, or claimants' possession of drugs or drug paraphernalia at the time of the seizure, would support the government's theory that the money in claimants' possession is connected to illegal drug trafficking."); *Currency: $4,424.00 (U.S.),* 1994 WL 568594, at *4 (evidence of claimant's "history of involvement in narcotics distribution" is probative); *Thomas,* 913 F.2d at 1116–17 (claimant's "history of illegal drug activity" and evidence of "[a]n informant's statement" implicating claimant in such activity is probative); *U.S. v. $37,780.00 in U.S. Currency,* 920 F.2d 159, 163 (2nd Cir.1990)(probative evidence introduced of claimant's "extensive involvement in drug activities.").

Sixth, the evidence presented by the government at trial established the absence of a legitimate origin of the defendant currency. (*See* Findings of Fact 27 through 38, *supra*). Such evidence, considered together with the other evidence presented at trial, suggests a "substantial

connection" between the currency and the drug trade. *See, e.g., Carrell,* 252 F.3d at 1201 ("[e]vidence that claimants...have no visible source of substantial income," is probative evidence in civil forfeiture proceeding) (citation omitted). *See also U.S. v. U.S. Currency, in the Amount of $150,660.00,* 980 F.2d 1200, 1207 (8th Cir. 1992)("the absence of any apparent verifiable, legitimate source for the [subject currency], coupled with all of the other evidence...strongly suggests that the defendant currency was connected with drug activity."); *Thomas,* 913 F.2d at 1115 ("[e]vidence that cash expenditures [by claimant] hugely exceeded any verifiable income suggests that the money was derived illegally."); *U.S. v. $250,000.00 in U.S. Currency,* 808 F.2d 895, 899 (1st Cir. 1987)("[t]he absence of any apparent legitimate sources for the $250,000 suggests that the money is derived from drug transactions.").

■■■ Even assuming *arguendo* that a portion of the defendant currency was derived legitimately from the proceeds of Ms. Prevo's seamstress business, as she maintains, Ms. Prevo's admission to Agent Fagan that at a significant portion of the currency derived from one or more drug transactions involving Mr. Wise supports the forfeiture of the currency. (*See* Finding of Fact 18, *supra*). "As a wrongdoer, any amount of the [subject property] traceable to drug activities forfeits the entire property." *U.S. v. One Single Family Residence Located at 15603 85th Avenue North, Lake Park, Palm Beach County, Florida,* 933 F.2d 976, 981 (11th Cir.1991). "[W]hen a claimant to a forfeiture action has actual knowledge, at any time prior to the initiation of the forfeiture proceeding, that claimant's legitimate funds are commingled with drug proceeds, traceable in accord with the forfeiture statute, the legitimate funds are subject to forfeiture."

*Id.,* at 982. *See also U.S. v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York,* 769 F.Supp. 80, 84 (E.D.N.Y.1991)("[e]ven if a portion of the property sought to be forfeited is used to 'facilitate' the alleged offense, then all of the property is forfeitable.").

Seventh, and finally, Ms. Prevo continually provided inconsistent and falsified testimony with respect to several key points raised during the trial, including her own attempts to show a legitimate origin of the defendant currency. (*See* Findings of Fact 18, and 32 through 45, *supra*). Ms. Prevo's lack of veracity and credibility provides another circumstance lending additional support for the government's assertion that the defendant currency is "substantially connected" to the drug trade. *See, e.g., Puche–Garcia,* 2000 WL 1288181, at *4 ("[t]he explanation that [claimant] provided to the deputies was inconsistent and confusing."); *$37,780.00 U.S. Currency,* 920 F.2d at 163 (claimant's "evasive, confused explanation for carrying such a large sum" of currency may support a finding of forfeiture); *U.S. v. $9,135.00 in U.S. Currency,* 1998 WL 329270, *3 (E.D.La.1998)("the myriad of inconsistencies evident in claimant's explanation as to the source of the money and the duration of her stay in Houston, a known source city for drugs, underscores the fact that her story is simply not credible.").

On the basis of the above factors, the Court concludes that the government has sustained its burden of proof to warrant the forfeiture of the defendant currency. "The aggregation of facts, each one insufficient standing alone, may suffice to meet the government's burden." *$67,220.00 in U.S. Currency,* 957 F.2d at 284. In this regard, in civil forfeiture proceedings, "[c]ourts have been cautioned not to dis-

**1236**

sect strands of evidence as discrete and disconnected occurrences." *Thomas,* 913 F.2d at 1115 (quotation marks and citations omitted). In such cases, the Court must judge the evidence "not with clinical detachment but with a common sense view to the realities of normal life," in the "totality of the circumstances." *U.S. v. $4,255,000.00,* 762 F.2d 895, 903–04 (11th Cir.), *cert. denied,* 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1986). *See also Puche–Garcia,* 2000 WL 1288181, at *4 (in evaluating evidence in a civil forfeiture proceeding, the court shall "consider all of these facts in the totality . . . .").

The above factors, considered in their aggregate, persuade the Court that a preponderance of the evidence exists to show a "substantial connection" between the defendant currency and the purchase or sale of crack cocaine. 18 U.S.C. § 983(c)(3). As such, the currency is subject to forfeiture because the currency constitutes " . . . moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . [or] all proceeds traceable to such an exchange, [or] . . . moneys . . . used or intended to be used to facilitate . . ." the same. 21 U.S.C. § 881(a)(6).

II. *The Defendant Revolver and Ammunition*

■■ As an initial matter, Ms. Prevo has standing to contest the forfeiture of the defendant revolver and ammunition. Although Ms. Prevo does not assert legal ownership over the revolver and ammunition, she appears to assert some degree of possessory interest over them. Again, Ms. Prevo testified that the revolver had been given to her by a "friend" of another friend of hers named Wardell Washington. (*See* Finding of Fact 8, *supra*). "A claimant need not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing." *U.S. v. $38,000.00 in U.S. Currency,* 816 F.2d 1538, 1544 (11th Cir.1987).

The Court concludes that the government has met its burden of demonstrating an entitlement to forfeiture of the defendant revolver and ammunition. 21 U.S.C. § 881(a)(11) provides in pertinent part that "[a]ny firearm . . . used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of [drugs or drug paraphernalia] . . ." is subject to forfeiture. Thus, in sum, it is the government's burden with respect to the defendant revolver and ammunition to prove by a preponderance of the evidence that there is a "substantial connection" between those items and drug activity. 18 U.S.C. § 983(c). The Court observes that the evidence presented at trial by the government with regard to these items was largely unrebutted by Ms. Prevo.

■ In the present action, as found *supra,* when approached by Officer Mitchum on August 13, 2000, Ms. Prevo then told Sergeant Mitchum that she had a gun in her purse. (*See* Finding of Fact 7, *supra*). Ms. Prevo eventually handed to Officer Turberville a loaded .22 "American Arms" magnum revolver that had been in her purse on the front seat of her automobile. Ms. Prevo testified that the revolver belonged to a "friend" of another friend of hers, Wardell Washington, whom, as discussed *supra,* the evidence at trial shows was engaged in at least one drug transaction at Ms. Prevo's residence in October 2000. (*See* Finding of Fact 25, *supra*). Ms. Prevo stated to Agent Fagan that she possessed the revolver for her own "protection." (*See* Finding of Fact 17, *supra*). Considering that the Ms. Prevo possessed both illegal drugs and a large sum of money which the court has determined to be substantially connected to the drug trans-

action, the court finds that the gun was also substantially connected to the furtherance of drug activity.

■ Accordingly, the Court concludes that the defendant revolver and ammunition, in association with the defendant currency, the crack cocaine, and the crack cocaine paraphernalia, more likely than not was a tool of the drug trade. It is generally recognized that firearms are "tools of the trade of those engaged in illegal drug activities and are highly probative in proving criminal intent." *U.S. v. Martinez*, 808 F.2d 1050, 1057 (5th Cir.), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987). It has been observed that, "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales . . . glassine bags, cutting equipment and other narcotic equipment." *U.S. v. Perez*, 648 F.2d 219, 224 (5th Cir.), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981) (citations omitted).[5] *See also U.S. v. Kearney*, 560 F.2d 1358, 1369 (9th Cir.), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977)("[p]ossession of a firearm demonstrates the likelihood that a defendant took steps to prevent contraband or money from being stolen.").

Therefore, a preponderance of the evidence exists to show a "substantial connection" between the defendant revolver and ammunition and drug activity. 18 U.S.C. § 983(c). As such, these items are subject to forfeiture because they were "used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of [drugs or drug paraphernalia] . . ." 21 U.S.C. § 881(a)(11).

*CONCLUSION*

Accordingly, the undersigned determines that judgment be entered in favor of plaintiff United States, and that the defendant currency ($22,991.00), revolver (.22 Magnum, Serial Number 214835) and ammunition, be forfeited to the permanent custody and control of the United States. The United States Marshall's Service is directed to take appropriate and customary action with respect to these items.

---

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.